James WHELEHAN, Individually, Kathleen Whelehan, Individually, Maura Whelehan, by her Parents and Natural Guardians, James Whelehan & Kathleen Whelehan, Margaret Whelehan, by her Parents and Natural Guardians, James Whelehan and Kathleen Whelehan, Plaintiffs,

v.

The COUNTY OF MONROE, the Department of Social Services of the County of Monroe, the Monroe County Sheriff, Gabriel T. Russo, Individually and in his capacity as Commissioner of the Department of Social Services of the County of Monroe, W. Burton Richardson, Individually and in his capacity as an employee of and/or Commissioner of the Department of Social Services of the County of Monroe, Leonora Simmons, Individually and in her capacity as a Caseworker and Employee with and of the Department of Social Services of the County of Monroe, Paul Caccamise, Individually and in his capacity as a Child Protective Supervisor and Employee of and with the Department of Social Services of the County of Monroe, Celeste Ciaccia, Individually and as a Caseworker and Employee of and with the Department of Social Services of the County of Monroe, Anthony Yazback, Individually and in his capacity as Chief of Detectives and as an Employee of and with the Monroe County Sheriff, Ronald A. Giacobbe, Individually and as an Employee, Assistant, Agent and/or Deputy of the Sheriff of the County of Monroe, Leon Hill, Individually and as an Employee, Assistant, Agent and/or Deputy of the Sheriff of the County of Monroe, Philip Knight, Individually and as an Employee, Assistant, Agent and/or Deputy of the Sheriff of the County of Monroe, Russell Coon, Individually and as an Employee, Assistant, Agent and/or Deputy of the Sheriff of the County of Monroe, Stephen Epstein, Individually and as Attorney for and Employee of the Department of Social Services of the County of Monroe, Defendants.

No. CIV–81–135B(E).

United States District Court, W.D. New York.

Feb. 22, 1983.

Edwin R. Schulman, Rochester, N.Y., for plaintiffs.

Nina T. Kermisch, Rochester, N.Y., for defendants.

## MEMORANDUM and ORDER

ELFVIN, District Judge.

### BACKGROUND

This civil rights litigation concerns events arising from determinations made in 1979 by certain pediatricians that the urine of infant plaintiff Maura Whelehan contained sperm cells. Upon lawful referral of this information to the authorities, various defendants allegedly took measures and conducted themselves in ways which plaintiffs assert deprived them of the due process of the law and resulted in injury to themselves. The jurisdiction of this court is invoked under 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3), and under the federal question jurisdictional statute, 28 U.S.C. § 1331. Pendent jurisdiction is sought for certain tort claims not constituting federally cognizable complaints.

The actions complained of are alternatively alleged to have been performed either by policy-making personnel of the institutional defendants, or in accord with existing official policies, or due to the lack of such policies, or through failure to adhere to such policies. Certain acts are alleged to have been performed in accordance with official policy.

Plaintiffs assert that defendants made statements concerning James Whelehan's supposed sexual conduct with his baby

daughter, plaintiff Maura, to his employer, to news media and to various governmental agencies, with knowledge of their falsity and with malicious intention to harm James's reputation and to endanger his employment or impair his prospects of advancement. Such statements are said to have been made both by defendants The Monroe County Sheriff ("the Sheriff") and The Department of Social Services of the County of Monroe ("the Department"), through their employees and more particularly by defendant Anthony Yazback, Chief of Detectives.

It appears that at one point after James had come under official suspicion of sexual misconduct with Maura, her pediatricians reported a third finding of sperm cells in her urine, upon which the Department's employees removed Maura from her home. After less than a week of Maura's absence an agreement was reached whereby James left his household and Maura was returned to her mother. It is not clear how long James remained away from his home. Plaintiffs assert that these disruptions of their family life were the result of negligent investigatory practices of the Department and the Sheriff's Department and deprived James and Kathleen of their mutual rights to consortium, and deprived all plaintiffs of their rights to the care, comfort, society and companionship of each other, in violation of their constitutional liberty and privacy interests in maintaining their family life. The procurement of these separations is also said to have lacked due process of law inasmuch as they were brought about through *ex parte* proceedings from which plaintiffs and their attorneys were purposely excluded, "and/or" by deliberate presentation of false or incomplete evidence and exclusion of exculpatory evidence, "and/or" by threats directed towards plaintiffs by defendants.

The plaintiffs assert further that the negligent investigatory practices of defendants culminated in a Family Court proceeding against James and Kathleen, instituted in accord with official policies of the institutional defendants, in which the adult plaintiffs were charged with child abuse and neglect. Plaintiffs claim this proceeding was commenced and continued with knowledge of its groundlessness and characterize this conduct both as a deprivation of due process and as malicious prosecution. Plaintiffs also claim that, in the course of these proceedings and the preliminaries thereto, defendants deliberately and wrongfully refused and neglected to furnish plaintiffs and the court with exculpatory evidence to which plaintiffs were entitled and also negligently or deliberately supplied plaintiffs' attorneys and the court with false and misleading information.[1]

Plaintiffs further allege violations of the constitutionally protected right to privacy of James and Kathleen through interrogations, by false representations as to the results of lie detector tests voluntarily taken, which false representations were made to prompt a confession of wrongdoing from James Whelehan (which representations caused him to divulge intimate details of his life) and by forcing James and Kathleen to undergo psychiatric testing. Plaintiffs complain also of defendants' alleged attempts to obstruct plaintiffs' efforts to have the records of the Family Court proceedings expunged and their names removed from lists of child neglecters and molesters kept by various agencies.

Finally, plaintiffs complain that defendants The County of Monroe ("the County")

---

1. The Family Court dismissed the charges *against James and Kathleen August 18, 1980* upon motions of attorneys for all the parties. *In re Maura Whelehan,* No. N 266–79, and *In re Margaret Whelehan and Maura Whelehan,* No. N 388/389–79 (New York Family Court, Monroe County, August 18, 1980) (Defendants' Notice of Motion Exhibit B). Apparently the precipitant of this result was that two independent specialists who had been consulted in March, 1980 found that the caudate cells in Maura Whelehan's urine were of varieties that might ordinarily be found there and were not sperm cells. This consultation apparently was the first attempt to verify the findings that Maura's pediatricians had made first in June, 1979 and rechecked and reconfirmed themselves upon fresh urine samples in July and September of 1979, and in January and February 1980. *See* Defendants' *Memorandum of Law* 1–2; Defendants' Supplemental Affidavit, Exhibits B and C.

and Yazback have deliberately made false accusations and used innuendo against James in a state court action that James instituted against these defendants charging them with libel and slander.[2]

In addition to the injuries recited in the foregoing recapitulation of plaintiffs' claims, it is alleged that as consequences of defendants' conduct James and Kathleen were forced to sell their home and purchase new premises, were psychologically damaged and have incurred expenses in defending against the charges of child abuse and neglect and securing the return of their family to a condition of normalcy.

Plaintiffs each seek $1,000,000 for actual damages and $5,000,000 for punitive damages and request that defendants be ordered to take certain actions aimed at restoring plaintiffs' reputations.

Defendants have moved to dismiss plaintiffs' claims or, alternatively, for summary judgment. In view of the extensive extra-pleading materials that have been submitted by both sides on this motion, it will be treated as one for summary judgment under Fed.R.Civ.P. rule 56. Defendants contend that the instant action is time-barred by the applicable statute of limitations, that the Complaint fails to state a cause of action under 42 U.S.C. § 1983, that the Department is not a legal entity which may be sued, that the County, the Department, the Sheriff, defendant Gabriel T. Russo and defendant W. Burton Richardson are not liable under the theory of *respondeat superior* and that all defendants are protected from the instant suit by either absolute or qualified immunity.

## ANALYSIS

### I. *Statute of Limitations*

■ Defendants do not contend that plaintiffs' cause of action is time-barred under the three-year statute of limitations that the United States Court of Appeals for the Second Circuit has consistently held applicable to suits brought under 42 U.S.C.

§ 1983 (*e.g., Singleton v. City of New York,* 632 F.2d 185 (2d Cir.1980), *cert. denied,* 450 U.S. 920, 101 S.Ct. 1368, 67 L.Ed.2d 347 (1981); *Taylor v. Mayone,* 626 F.2d 247 (2d Cir.1980); *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438 (2d Cir.1980); *Meyer v. Frank,* 550 F.2d 726 (2d Cir.1977), *cert. denied,* 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 90 (1977). Defendants contend rather that the propriety of applying the three-year statute, borrowed from New York's Civil Practice Law and Rules ("CPLR") § 214(2), requires reexamination in light of the decisions in *Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979), *State v. Cortelle Corp.,* 38 N.Y.2d 83, 378 N.Y.S.2d 654, 341 N.E.2d 223 (1975), and *Staffen v. City of Rochester,* 80 A.D.2d 16, 437 N.Y.S.2d 821 (4th Dept.1981). Defendants urge that these decisions require the rejection of CPLR § 214(2) in favor of the one-year-and-ninety-days period for bringing suits against municipalities provided by New York's General Municipal Law § 50–i, and the one-year limitations period for suits against a sheriff and his deputies under CPLR § 215(1).

In response to this claim of defendants it suffices to note that it has recently been thoroughly analyzed and rejected by our Court of Appeals, in *Pauk v. Board of Trustees of City University of New York,* 654 F.2d 856, 861–867 (2d Cir.1981). Accordingly, the three-year period provided by CPLR § 214(2) must be held applicable to plaintiffs' claims, which are predicated upon alleged conduct which occurred no longer ago than mid-1979 and are therefore not time-barred.

### II. *Claims Against the Governmental Defendants and the Department's Employees*

#### A. *Malicious Prosecution and Related Claims*

##### 1. *Liability of Individual Defendants*

■ Certain allegations of plaintiffs' first "cause of action" may be taken to

---

**2.** It appears that, after a substitution of the Sheriff for the Sheriff's Department as a party defendant, this state court action was dismissed except as to Yazback and cross-appeals are now pending on the dismissal rulings. Defendants' Memorandum of Law 2.

allege the common law tort of malicious prosecution. A malicious prosecution under color of state law may give rise to a federal cause of action under 42 U.S.C. § 1983 only if injuries of federal constitutional dimensions are involved. *Norton v. Liddel,* 620 F.2d 1375, 1378 (10th Cir.1980); *Hampton v. Hanrahan,* 600 F.2d 600, 630 (7th Cir.1979); *Beker Phosphate Corp. v. Muirhead,* 581 F.2d 1187, 1189 (5th Cir.1978); *Nesmith v. Alford,* 318 F.2d 110, 125–126 (5th Cir.1963); *Pyles v. Keane,* 418 F.Supp. 269, 276 (S.D.N.Y.1976). *Compare, Dellums v. Powell,* 490 F.Supp. 70, 72 (D.D.C.1980). Here one or more preliminary protective orders of the Family Court disrupted the familial relationships of plaintiffs (First Answering Affidavit of Edwin R. Schulman, attorney for plaintiffs, Exhibit B, at 4–5), clearly implicating federally protected rights of high order (*see, e.g., Duchesne v. Sugarman,* 566 F.2d 817, 824–826 (2d Cir.1977).

█ Although plaintiffs have thus stated a section 1983 cause of action for malicious prosecution, it is nonetheless necessary to conclude that plaintiffs' claim in this regard is barred as to the individual defendants by the federal [3] immunity doctrine.

The individual defendants involved—the agents of the Department—are protected from liability for the alleged malicious prosecution under the absolute immunity doctrine enunciated in *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). *Imbler* noted that, if a prosecutor were exposed to liability for his or her official actions, the performance of prosecutorial duties would be hampered by the need to safeguard against incurring liability and by the dissipation of the prosecutor's energies toward the defense of civil suits. 424 U.S. at 424–425, 96 S.Ct. at 992–993. Analyzing further the exigencies of the prosecutorial task and the potential for impairment of the judicial process if prosecutors could be sued for malicious prosecution, the Court concluded that these considerations "dictate the same absolute immunity under § 1983 that the prosecutor enjoys at common law" (424 U.S. at 427, 96 S.Ct. at 993).

Applying the reasoning of *Imbler* to the instant case, it is necessary to conclude that the roles of the employees of the Department are sufficiently like the role of a prosecutor to warrant coverage by absolute immunity under *Imbler.* The great importance of the child-protective function served by these defendants is beyond question. If these defendants, and others who serve like functions in society, were forced to execute their duties with one eye constantly regarding the possibility of incurring liability for their conduct, the detriment to society and the judicial system would be at least as great as if they were prosecutors of the kind specifically protected by *Imbler.* In *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), the Court, applying considerations equally applicable to state and federal officers (438 U.S. at 504, 98 S.Ct. at 2909), extended the rule of *Imbler* to provide absolute immunity for "agency officials performing certain functions analogous to those of a prosecutor" (438 U.S. at 515, 98 S.Ct. at 2915). The Court reasoned that "there is a serious danger that the decision to authorize proceedings will provoke a retaliatory response" (*cf., Imbler, supra,* 424 U.S. at 425, 96 S.Ct. at 992), and that "[t]he defendant in an enforcement proceeding has ample opportunity to challenge the legality of the proceeding itself" and to "present his evidence to an impartial trier of fact and obtain an independent judgment as to whether the prosecution is justified" (438 U.S. at 515–516, 98 S.Ct. at 2915). All these considerations and conclusions are fully justified in the instant case.

The Court in *Butz* rejected an attempt to distinguish *Imbler* on the grounds that in an administrative action the initiating officials do not "act under 'serious constraints of time and even information' " as do prosecutors, noting that "[t]he key point is that administrative personnel, like prosecutors 'often must decide, especially in cases of wide public interest, whether to proceed to

---

**3.** In section 1983 cases the applicability of immunity doctrines is a question of federal law.

*Martinez v. California,* 444 U.S. 277, 284, 100 S.Ct. 553, 558, 62 L.Ed.2d 481 (1980).

trial where there is a sharp conflict in the evidence.'" 438 U.S. at 516, n. 40, 98 S.Ct. at 2916, n. 40. Although the "serious constraints of time and even information" were characterized as "not central" to *Imbler,* that is a relevant consideration which is fully operative in the context of the instant case, where a prompt decision to remove a child from a home and to seek protective orders in Family Court may be crucial to the life and health of the child. Thus *Butz v. Economou* requires *a fortiori* that the employees of the Department be protected by absolute immunity for their actions performed within the scope of their child-protective duties.

From the foregoing it is plain that I do not agree with the decision in *Doe v. County of Suffolk,* 494 F.Supp. 179 (E.D.N.Y. 1980), holding that a social worker charged with malicious prosecution based upon child protective proceedings is entitled only to a qualified "good faith" immunity. The basis of the court's decision was that unlike a prosecutor a social services worker has "virtually no discretion" regarding the institution of a child protective prosecution, once "[g]iven information warranting such a prosecution," and is therefore more akin to a policeman than a prosecutor. This rationale reflects the Supreme Court's concern as expressed in *Imbler* and *Butz* for preserving the discretion of prosecutorial officials, but gives too little weight—indeed no weight—to the other factors that persuaded the highest court to extend absolute immunity to such officials—namely, the frequency with which malicious prosecution actions against prosecutors would likely be initiated, the consequent diversion of a prosecutor's attention from his or her "pressing duty of enforcing the criminal law," the prosecutor's probable "greater difficulty in meeting the standards of qualified immunity than other executive or administrative officials" due to the need to make many pressured decisions that could give rise to

colorable constitutional claims, the effect that potential liability would have on the use of evidence at trial, and the potential for coloration of post-trial procedures by the reviewing judge's awareness that a decision in favor of the accused might lead to liability for the prosecutor (424 U.S. at 425–427, 96 S.Ct. at 992–993). Upon reviewing the relevant provisions of New York's Family Court Act and Social Services Law, I conclude that a social services worker is indeed called upon to exercise discretion at crucial points in cases of suspected child abuse or neglect—*i.e.,* in deciding whether the available information warrants removal of a child from the home either by order of a court or as an emergency measure, and the filing of a petition charging child abuse or neglect, thereby initiating court proceedings. If social services workers were required to guard against possible section 1983 claims arising from such decisions, their evaluation of the information at hand could easily be colored and, it may be expected, sometimes at the expense of the life or well-being of abused or neglected children. Such a result cannot be countenanced for the administration of remedial child-protective laws any more than for prosecutors' enforcement of the criminal laws.[4]

It is necessary at this point to consider whether any recognizable exception to the *Imbler* and *Butz* absolute immunity rule is present in the instant case.

In *Taylor v. Kavanagh,* 640 F.2d 450, 453 (2d Cir.1981), the court apparently endorsed the rule espoused in *Helstoski v. Goldstein,* 552 F.2d 564 (3d Cir.1977), that a prosecutor's "dissemination of false information to the press" causing damage to reputation would not be covered by absolute immunity under *Imbler,* but at most by a qualified good faith immunity. Paragraph XIX of the instant Complaint alleges that the accusations made by the defend-

---

**4.** I note further, as a material contradiction in the *Doe* decision, that it hinges upon a finding that social services child-protective workers "lack discretion" in the discharge of their duties, yet would expose them to prosecution

for "maliciously" instituting child protection measures and proceedings, and afford them a qualified immunity for actions "taken in good faith."

ants in court proceedings and to the public at large were provided to the news media without further specificity as to which defendants provided the same, or at what time, or to whom precisely, or as to the particular information allegedly released. Consequently, although certain of the plaintiffs may theoretically be able to state a viable claim that certain defendants in the course of executing their prosecutorial duties released defamatory statements to the public media, at this time the bare allegations of the Complaint to any such end or effect must be dismissed without prejudice under *Koch v. Yunich,* 533 F.2d 80, 85 (2d Cir.1976), for failure to allege specific facts showing that a constitutional violation of civil rights has occurred.[5]

Plaintiffs have offered no grounds showing that the conduct of the defendant employees of defendant Department of Social Services in the instant case comes within any other recognized exception to the rule of *Imbler.* There has been no suggestion

that defendants' actions were taken primarily to further a private purpose in filing charges known to be false or were beyond the scope of their duties. *Beard v. Udall,* 648 F.2d 1264, 1271 (9th Cir.1981). *But, see, Jennings v. Shuman,* 567 F.2d 1213, 1221–22 (3d Cir.1977).

The distinction, based on *Imbler,* between purely investigative and primarily prosecutorial functions of the prosecutor, as drawn in *Lee v. Willins,* 617 F.2d 320, 322 (2d Cir.), *cert. denied,* 449 U.S. 861, 101 S.Ct. 165, 66 L.Ed.2d 78 (1980), if broadly read into the instant case tenably could support an argument that the employees of the Department might be liable for otherwise culpable fault in the early phases of their investigation, culminating in the obtaining of preliminary protective orders. To so read either *Imbler* or *Lee v. Willins* would severely distort their holdings and wrongly fail to incorporate the full scope of the duties of these defendants within the *Imbler* and *Butz* rule. Those duties of responding to and investi-

---

5. Even in the absence of the cloak of absolute immunity which I herein hold protects both the individual and municipal defendants from plaintiffs' charges relevant to conduct clearly within the scope of defendants' child-protective duties under New York's Social Services Law, the instant motion to dismiss would dispose of several such claims due to the failure to allege specific facts showing the existence of a constitutional violation. *See Koch v. Yunich, supra.* Claims in this category include "providing false and misleading information to the courts; * * obtaining ex parte orders from Family Court by providing false information to the courts; * * purposely and intentionally excluding . the instant plaintiffs from the hearings in which said orders were obtained; * * * [and] threatening the instant plaintiffs" (First Answering Affidavit of Edwin R. Schulman, at p. 7). The Complaint itself is no more specific than this as to these four claims, nor has any indication appeared on the instant motion that there is a basis in fact for these bare assertions. Accordingly these claims would be dismissed even if the absolute immunity defense did not bar their prosecution. Plaintiff's argument that discovery will enable them to produce facts showing the bases for such claims has little merit. *See Quinn v. Syracuse Model Neighborhood Corp., supra,* 613 F.2d at 445.

Similarly, plaintiffs have failed to state a claim for denial of equal protection of the laws, notwithstanding the insertion of language purporting to state such a claim in plaintiffs' first "cause of action." Plaintiffs evidently intended

to suggest that the provisions of New York's Social Services Law have been enforced against them in a discriminatory manner. However, "intentional or purposeful discrimination is an essential element of a valid claim of unconstitutional, unequal statutory enforcement." *Friedlander v. Cimino,* 520 F.2d 318, 320 (2d Cir.1975). Plaintiffs have completely failed to suggest any discriminatory conduct or intent whatsoever in the actions taken by defendants in their case, and accordingly the claim for denial of equal protection of the laws must be dismissed.

The purpose for the exception in civil rights cases to the general rule of "notice pleading" is well-stated in *Kauffman v. Moss,* 420 F.2d 1270, 1276 n. 15 (3d Cir.), *cert. denied,* 400 U.S. 846, 91 S.Ct. 93, 27 L.Ed.2d 84 (1970), cited approvingly in *Koch v. Yunich, supra:*

" 'In recent years there has been an increasingly large volume of cases brought under the Civil Rights Acts. A substantial number of these cases are frivolous or should be litigated in the State courts; they all cause defendants—public officials, policemen and citizens alike—considerable expense, vexation and perhaps unfounded notoriety. It is an important public policy to weed out the frivolous and insubstantial cases at an early stage in the litigation, and still keep the doors of the federal courts open to legitimate claims.' [*Valley v. Maule,* 297 F.Supp. 958, 960 (D.Conn.1968) ]."

gating reports of suspected child abuse or neglect, and acting upon them in the interests of children, must be seen as "intimately associated with the judicial phase" of the Family Court's jurisdiction over such matters, under the functional approach espoused in *Imbler* (424 U.S. at 430, 96 S.Ct. at 995). To roughly equate on the basis of a superficial similarity the removal of a child from a home wherein it is suspected that there is imminent danger to the child's well-being, with a search and seizure conducted in connection with a criminal case, and thereby to invoke the exception to absolute prosecutorial immunity recognized in *Lee v. Willins* whereby a prosecutor who conducts an illegal search may be liable for violating Fourth Amendment privacy rights, would greatly blur necessary distinctions and imperil the strong public interest in the protection of children.

It is necessary therefore to conclude that plaintiffs' claim regarding the conduct of the employees of the Department, be it characterized as one for malicious prosecution or otherwise,[6] must be dismissed, the defense of absolute immunity, where valid, being fatal to an action at the pleading stage.

My decision that the Department's employees are entitled to absolute immunity when acting within the scope of their child-protective duties does not conflict with *Duchesne v. Sugarman,* 566 F.2d 817 (2d Cir. 1977). In *Duchesne* it was held that, where a child is removed from its home under a statutory provision for emergency removal without a prior court order and where a parent asks for the child's return, due process requires that the removing agency move promptly to initiate judicial proceedings to test the necessity for removal. 566 F.2d at 826–829. Inasmuch as one test of the scope of a prosecutor's absolute immunity is the extent to which the actions involved are " 'an integral part of the judicial process' " (*Imbler v. Pachtman, supra,* 424 U.S. at 430, 96 S.Ct. at 995), it is possible that failure to timely seek judicial sanction following an emergency removal would fall outside of the range of activity absolutely protected by immunity under *Imbler* and *Butz.*

In this case the employees were required by law after the emergency removal to "inform the [Family] [C]ourt * * * as soon as possible" (Family Court Act § 1024(a)(iv)), and thereafter to "forthwith

6. Plaintiffs' allegations that defendants willfully presented insufficient, incomplete or false information to the Family Court in *ex parte* hearings to secure preliminary protective orders and that defendants willfully failed, for over nine months, to turn over to plaintiffs evidence and information that would have completely exonerated plaintiff James, Complaint ¶¶ XXVI, XXVII & LI–LIV, do not necessarily sound in malicious prosecution. However, the decision in *Imbler v. Pachtman, supra,* did not limit absolute prosecutorial immunity to malicious prosecution.

> "For example, the swearing of warrants to insure a witness's attendance at trial, *Daniels v. Kieser,* 586 F.2d 64 (7th Cir.1978), *cert. denied,* 441 U.S. 931, 99 S.Ct. 2050, 60 L.Ed.2d 659 (1979), the falsification of evidence and the coercion of witnesses, *Lee v. Willins, supra,* or the failure to drop charges until immediately before trial, *Halpern v. City of New Haven,* 489 F.Supp. 841, 843 (D.Conn.1980) have been held to be prosecutorial activities for which absolute immunity applies. Similarly, because a prosecutor is acting as an advocate in a judicial proceeding, the solicitation and subornation of perjured testimony, the withholding of evidence,

> or the introduction of illegally-seized evidence at trial does not create liability in damages. *Lofland v. Meyers,* 442 F.Supp. 955, 958 (S.D.N.Y.1977). The rationale for this approach is sound, for these protected activities, while deplorable, involve decisions of judgment affecting the course of a prosecution. The efficient, and just, performance of the prosecutorial function would be chilled if Government attorneys were forced to worry that their choice of trial strategy and tactics could subject them to monetary liability, or at best, the inconvenience of proving a 'good faith' defense to a § 1983 action." *Taylor v. Kavanagh, supra,* 640 F.2d at 452.

Moreover, in *Imbler v. Pachtman, supra,* applicable with full force to the instant case, the majority expressly rejected the suggestion of the concurring opinion that absolute immunity should not cover a prosecutor's suppression of exculpatory evidence in presenting the state's case. 424 U.S. at 431–432, n. 34, 96 S.Ct. at 995–996, n. 34. Thus both *Imbler* itself and the subsequent applications of the *Imbler* absolute immunity doctrine approved in *Taylor v. Kavanagh* fully apply in the instant case to defendants' alleged misconduct in the presentation or withholding of evidence.

cause a petition to be filed under [the Family Court Act]" (*id.* at § 1026(c)), unless Maura had been returned to her home pursuant to Family Court Act § 1026. Upon the filing of a petition, the Family Court was required to "hold a hearing as soon as practicable * * * to determine whether the child's interests require protection pending a final order of disposition." (*Id.* at § 1027(a)).

There has been no indication in this case that these procedures were not followed; in fact it is quite apparent that they were. Plaintiffs complain, however, that the judicial sanctions involved were obtained by means of "ex parte hearings and proceedings from which plaintiffs and their attorneys were purposely and intentionally excluded." Complaint, ¶ XXVI. Although "hearings" of this nature may be deficient under *Duchesne* (a question that I need not decide), I have already stated my conclusion that this and similar allegations are not sufficiently specific to withstand a motion to dismiss (see note 5, *supra*). Moreover, Defendants' Memorandum of Law, submitted April 13, 1981, at page 13 thereof explicitly states that the adult plaintiffs were "giv[en] a date for a hearing * * * in which they were given a full opportunity to be heard and challenge the orders that were obtained *ex parte.*" In plaintiffs' second Answering Affidavit, submitted May 18, 1981, no attempt is made to refute this assertion. The Complaint, at paragraph XXII, admits that the adult plaintiffs were made "parties to [Family Court] proceedings and * * * served with numerous processes and petitions by said Family Court" beginning "on or about July 2, 1979," which was prior to the removal of Maura. While assertions made in a memorandum of law are not evidence, plaintiffs' failure to substantiate the bare allegation of the Complaint in the face of defendants' refutation confirms in this case, where plaintiffs are represented by competent counsel, the propriety of independently applying the rule that civil rights complaints must plead specific facts showing entitlement to relief, which rule is bottomed partly on the suspicion that if such provable facts existed they would have been pled.

Furthermore, in this case wherein plaintiffs were represented by counsel during the Family Court proceedings and where section 1028 of the Family Court Act specifically requires a "hearing to determine whether the child should be returned * * * if there has not been a hearing on the removal of the child at which the parent or other person legally responsible was present or had an adequate opportunity to be present," such hearing to be held within three days of application therefor, there is much less cause to find that plaintiffs were not afforded due process of the law than was present in *Duchesne v. Sugarman, supra,* where it was held that the availability of state court habeas corpus proceedings does not provide due process for lawyerless parents who have expressed their desire for their children's return. (566 F.2d at 828 n. 26). Consequently, if the insufficiency of the instant Complaint regarding the judicial process by which the removal of Maura was sanctioned did not justify dismissal of that charge (as I hold it does) and if defendants' conduct in this regard were not entitled to absolute protection under *Imbler* and *Butz* (as I hold it is), defendants would almost certainly still be entitled to summary judgment on this claim.

### 2. *Liability of the Governmental Defendants*

■ Having concluded that the individual employees of the Department are protected from liability for malicious prosecution and related charges under the federal immunity doctrine, it remains to be considered whether summary judgment or dismissal of these claims is warranted as to the governmental defendants, whom plaintiffs seek to hold liable under the doctrines of *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), and *Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980).

In order for plaintiffs to state a claim for recovery from the governmental defendants for the allegedly tortious conduct of the

individual employees of the Department, it is necessary at a minimum to allege that such conduct occurred in execution of

"a 'government's policy or custom' [which] may be promulgated either 'by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.' [*Monell v. Department of Social Services, supra,*] at 694 [98 S.Ct. at 2037–2038] * * *." *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 448 (2d Cir.1980).

Plaintiffs have alleged that certain—but not all—of the defendants herein whose conduct is said to relate to the alleged malicious prosecution and related claims—namely, Russo, Richardson, defendant Caccamise, and defendant Stephen Epstein—were responsible for initiating or promulgating the official policies or customs which gave rise to such claims. I do not—and indeed cannot—at this juncture express any opinion whether any of such individuals was indeed a policy-making official. For the present it is sufficient to observe that plaintiffs have failed to allege with specificity that any particular action was taken pursuant to any particular policy, that any specified policy exists, or indeed that any particular defendant performed any of the particular actions alleged in connection with the claims under consideration. The only specification as to the actors involved is that "the defendants" performed the complained-of conduct. This allegation does not permit a determination that any wrongdoer is or was a policy-making governmental officer. With two exceptions, the typical allegation in the relevant part of the Complaint ("First Cause of Action"), relative to the execution of official policy or custom reads in pertinent part as follows:

"Upon information and belief, the [complained-of conduct occurred] by reason of either the afore stated [sic] Defendants' procedures, standards, policies and/or guidelines and/or their failure to have guidelines, procedures and standards of investigation and conduct for its employees and agents involved in cases of suspected child abuse and neglect and/or by virtue of said Defendants' and their agents, servants and employees' failure to adhere to, follow, and accept such standards, procedures and guidelines as existed." Complaint ¶ XX.

Such an allegation obviously contemplates that the official governmental policy or custom may have required the defendants to conduct themselves in a manner which would not have given rise to plaintiffs' grievances, and thus fails to state a claim of governmental liability for the constitutional wrongs of the immunized alleged tortfeasors.

The noted exceptions are found in paragraphs XXIII and XXX of the Complaint. Paragraph XXIII alleges that the legal proceedings, which "the defendants" are alleged in the preceding paragraph to have initiated against the adult plaintiffs in Family Court "were instigated in conformity with the procedures, standards, policies and/or guidelines of the County of Monroe, the Department of Social Services of the County of Monroe and the Monroe County Sheriff." Thus paragraph XXIII alleges the execution of a governmental policy, but as of this point in the Complaint nothing had been said to indicate that the mere initiation of the court proceedings, alleged in paragraph XXII, in any way wronged plaintiffs. Such indications are contained in several succeeding paragraphs, epitomized in paragraph XXIX as follows:

"Upon information and belief, the petitions and proceedings which Defendants commenced in the Family Court of the State of New York were commenced with papers knowingly providing and alleging insufficient facts and materials to warrant the commencement and continuation of proceedings initiated in said Court and affecting the relationship between the Plaintiffs, and were intentionally commenced and continued with at a time that Defendants were aware that they had absolutely no evidence and/or material to warrant the commencement and continuation of said proceedings."

Paragraph XXX then alleges that "said legal proceedings and procedures were instigated in conformity with the procedures,

standards, policies and/or guidelines of the County of Monroe, the Department of Social Services of the County of Monroe and the Monroe County Sheriff." Assuming, without deciding, that the Complaint adequately alleges a malicious prosecution (or other conduct) actionable under section 1983, XXIX and XXX, read together and broadly, indicate that such malicious prosecution was instituted according to official government policy, potentially paving the way for a finding of liability of one or more of the governmental defendants for the constitutional torts of the immunized employees.

These two paragraphs cannot, however, be given such broad interpretation. Paragraph XXX does not provide an unequivocal allegation that the institution of the legal proceedings involved was in conformity with governmental policy or custom in the aspect that such institution was allegedly with knowledge of groundlessness. Due to the seriousness of such an allegation, if such was indeed intended, it is fitting under the principle enunciated in *Koch v. Yunich, supra,* as well as the policy underlying the requirement of Fed.R.Civ.P. rule 11 that pleadings be signed by an attorney of record, as a "certificate by him that * * * to the best of his knowledge, information and belief there is good ground to support the pleading," that there be an enlargement of the details set forth and specific allegations of fact.

The foregoing analysis requires that the claim for malicious prosecution and the claims related thereto involving the interference with plaintiffs' familial relationships must be dismissed against the government defendants for insufficiency of the allegations concerning any official policies or customs. Such dismissal, however, shall not preclude plaintiffs from conducting limited discovery of information pertaining to the official policy issue, and is without prejudice to the amendment of the Complaint to adequately allege official policy or custom as the source of plaintiffs' injuries alleged in the claims involved.

This disposition makes unnecessary a determination whether the governmental defendants are entitled to protection under federal immunity doctrine, as contended by defendants. Nevertheless, it is fitting to indicate, admittedly by way of *obiter dictum,* my conclusions in that regard.

*Owen v. City of Independence, supra,* held "that [a] municipality may not assert the good faith of its officers or agents as a defense to liability under § 1983." 445 U.S. at 638, 100 S.Ct. at 1409. Although certain phrases in the *Owen* opinion suggest an intention to do away with *all* municipal immunity to claims brought under section 1983—a position espoused by plaintiffs herein—that decision, correctly read, applies only to the qualified good-faith immunity asserted by the respondent in that case. *Owen* left open the door to the admission of other municipal immunities against section 1983 claims. Consequently, as the United States Supreme Court has recently observed, in a decision holding municipalities to be immune against punitive damages under section 1983, "the contours of municipal liability under § 1983 * * * are currently in a state of evolving definition and uncertainty." *Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 256, 101 S.Ct. 2748, 2754, 69 L.Ed.2d 616 (1981). Thus, the question whether absolute immunity under section 1983 for prosecutorial-type activity should be extended to municipalities, apparently one of first impression, must receive its own analysis in the light of the principles endorsed in *Owen* and other section 1983 immunity cases.

A first analytical step should be to test for the prominence of the purported immunity in question in the common law at the time Congress enacted the predecessor of section 1983, section 1 of the Civil Rights Act of 1871. If such immunity had at that time been well-established and supported by strong policy considerations, the inference is summoned that, had Congress intended to eliminate that immunity in section 1983 suits, it would have done so expressly. *See e.g., Owen v. City of Independence, supra,* 445 U.S. at 637–650, 100 S.Ct. at 1408–1415; *Newport v. Fact Concerts, Inc., supra,* at

263, 101 S.Ct., at 2757–58. It is then necessary to determine whether considerations of public policy dictate a result contrary to this deduction of Congressional intention in regard to the particular immunity. *Newport v. Fact Concerts, Inc., supra,* at 266, 101 S.Ct., at 2759. *Cf., Owen v. City of Independence, supra,* 445 U.S. at 650–651, 100 S.Ct. at 1415–1416. Finally, the extent to which the proposed immunity accords with or would frustrate the compensatory and deterrent functions of section 1983 is to be considered. *Newport v. Fact Concerts, Inc., supra,* at 268–269, 101 S.Ct., at 2760–2761; *Owen v. City of Independence,* 445 U.S. at 650–652, 100 S.Ct. at 1415–1416. In the instant case the analysis leads to affirming the existence of an absolute immunity of municipal bodies against liability for acts performed within the scope of prosecutorial-type duties.

It is unnecessary in the instant case to conduct a lengthy inquiry into the status at common law in 1871 of municipal liability for the torts of its agents committed in the course of executing prosecutorial and prosecutorial-type duties. The analysis in *Owen v. City of Independence, supra,* 445 U.S. at 644–650, 100 S.Ct. at 1412–1415, of both the "governmental capacity" and "discretionary act" tort immunities enjoyed by municipalities at that time suffices to show that a municipality generally would have been held immune from liability for such conduct under one or the other of these immunity principles—although to be sure the Court's explanations of the inability of these immunity doctrines to support recognition of a qualified good-faith immunity also completely undermines their relevance to *any* municipal immunity under section 1983.[7] Inasmuch as I submit that considerations of public policy, coupled with the limited ability of non-recognition to advance the aims of section 1983, indicate that Congress cannot reasonably be held to have intended to expose municipalities to liability for the conduct of prosecutorial officials acting within the scope of their duties and consequently require recognition of absolute municipal immunity for torts within the sphere of *Imbler v. Pachtman* and *Butz v. Economou,* I will not further expand upon that analytical aspect.[8]

The prime consideration requiring extension to municipalities of absolute immunity for torts within *Imbler* and *Butz* is that the dangers (to the public) found in those decisions to necessitate absolute immunity for public servants executing prosecutorial and prosecutorial-type duties are not greatly reduced if municipalities are held liable in the servants' stead. In *Owen* the Court found that the two mutually dependent main poli-

---

7. The Court ruled that under the doctrine of governmental immunity, grounded as it is on the principle of sovereign immunity, the good or bad faith of a municipal official was irrelevant to municipal liability for its governmental actions; consent to suit was the only avenue by which a municipality could be sued for its government actions. "More fundamentally," the governmental immunity doctrine was not incorporated in section 1983 by virtue of Congress's inclusion of municipalities within the class of "persons" which the section subjected to liability for violations of the federal Constitution and laws; section 1983 thus constituted a consent to suit for governmental actions. 445 U.S. at 647–648, 100 S.Ct. at 1413–1414. Regarding the "discretionary function" common law immunity, the Court observed that "a municipality has no 'discretion' to violate the Federal Constitution" and that a court adjudicating a section 1983 action against a municipality is not substituting its judgment for that of a municipality but merely assesses the challenged actions for conformity to the federal Constitu-

tion and laws. 445 U.S. at 649, 100 S.Ct. at 1414.

8. Dispensing with a thorough analysis of the status of a proposed section 1983 immunity in 1871 finds support in the analysis of public policy and legislative purpose in *Owen v. City of Independence, supra,* 445 U.S. at 650–656, 100 S.Ct. at 1415–1418, further supporting the Court's conclusion that there existed in 1871 "no 'tradition so well grounded in history and reason' that would warrant the conclusion that in enacting [section 1983] the 42d Congress *sub silentio* extended to municipalities a qualified immunity based on the good faith of their officers." (445 U.S. at 650, 100 S.Ct. at 1415.) This further analysis by the Court clearly was made with the awareness that considerations of public policy and legislative purpose could support recognition of an immunity to section 1983 liability even in the absence of a well-documented and firmly entrenched correlative immunity at common law in 1871.

cy considerations underlying recognition of a qualified good-faith immunity for certain municipal officials—namely

" '(i) the injustice, particularly in the absence of bad faith, of subjecting to liability an officer who is required, by the legal obligations of his position, to exercise discretion; (2) the danger that the threat of such liability would deter his willingness to execute his office with the decisiveness and the judgment required by the public good' " (445 U.S. at 654, 100 S.Ct. at 1417) [9]—

are greatly reduced in force where it is the municipality, not the official, that is being held liable. The first consideration is then "simply not implicated" (445 U.S. at 654, 100 S.Ct. at 1417), and the second is seen as translated into "an incentive for officials who may harbor doubts about the lawfulness of their intended actions to err on the side of protecting citizens' constitutional rights." (445 U.S. at 652, 100 S.Ct. at 1416.)

In the instant case too, the first of these policy considerations is not implicated if liability were imposed on a municipality rather than upon individual officers. However, the second consideration—the danger of inhibiting public decisionmaking—is to be given much greater weight in the context of prosecutorial functions than in that of the public functions at issue in *Owen*, as clearly appears from the fact that the United States Supreme Court has decided that individuals performing the former functions are to be protected by an absolute immunity from section 1983 liability and the latter only by a qualified immunity.

The reasons for this greater protection of individuals performing prosecutorial functions, already adverted to herein, are fully stated in *Imbler v. Pachtman, supra,* 424 U.S. at 424–429, 96 S.Ct. at 992–994 and may be summarized for present purposes as follows: (1) the fearlessness and impartiality peculiarly required of a public prosecutor would be impaired, and public confidence in the office would consequently suffer, if he "were constrained in making every decision by the consequences in terms of his own potential liability in a suit for damages;" (2) section 1983 suits against prosecutors could be expected to be frequent, because defendants' resentment at being prosecuted will often be vented in civil suits against prosecutors; (3) the particularly "pressing duty of enforcing the criminal law" would be neglected if prosecutors were required to answer in court to every charge of wrongdoing; (4) prosecutors "frequently ac[t] under serious constraints of time and even information" and must frequently make strategic moves the constitutionality of which may often be questionable, so that honest prosecutors would be exposed to the danger of liability in section 1983 suits if protected only by a qualified, good-faith immunity; (5) the need to present all relevant evidence to the triers of fact in order for the criminal justice system to function properly would be neglected if the prosecutor's discretion to use witnesses and evidence whose reliability may be questionable were hampered by considerations of personal liability; (6) post-conviction remedies open to convicted defendants could be impaired "by even the subconscious knowledge [of reviewing judges] that a post-trial decision in favor of the accused might result in the prosecutor's being called upon to respond in damages for error or mistaken judgment;" and (7) unlike other public officials whose actions could violate persons' constitutional rights, a prosecutor is "amenabl[e] to professional discipline by an association of his peers," which, together with possible criminal liability for willful deprivations of constitutional rights under 18 U.S.C. § 242, "undermine[s] the argument that the imposition of civil liability is the only way to insure that prosecutors are mindful of the constitutional rights of persons accused of crime."

It is manifest that these policy considerations do not lose much of their force when a municipal defendant rather than an individ-

---

**9.** The quotation is from *Scheuer v. Rhodes,* 416 U.S. 232, 240, 94 S.Ct. 1683, 1688, 40 L.Ed.2d 90 (1974).

ual prosecutor or quasi-prosecutor is the payor of damage claims under section 1983. The natural concern of responsible officials for safeguarding the public treasury, which the Court in *Owen*—ascribing perhaps somewhat less persuasive power to this concern than it deserves (*see Owen v. City of Independence, supra,* 445 U.S. at 656, 668–669, 100 S.Ct. at 1418, 1424–1425)—found would result in a desirable bias toward protection of individuals' rights (445 U.S. at 652, 656, 100 S.Ct. at 1416, 1418), would impermissibly interfere with the performance of duties prosecutorial in nature and with the need for adjudications upon all the relevant and tenably admissible evidence at trial and would imperil the fairness at review stages of public proceedings against defendants. The *Imbler* decision compels this conclusion, obviating the need for a detailed catalog of the deleterious effects to be anticipated from the contrary conclusion.

Moreover, the considerable frequency with which claims against prosecutors would likely be brought if municipalities were answerable in damages also argues strongly in favor of extending the *Imbler* and *Butz* absolute immunity to municipalities. Whether it is the municipality or the individual officer who is to be held answerable, the need for the officer's attendance at discovery and trial proceedings is the same, invoking the concern that to allow charges of prosecutorial malfeasance to survive the pleading stage would frustrate the compelling public need for enforcement of criminal sanctions or, in the instant case, for the protection of endangered children.

It is proper to consider the potential impact on the public treasury if municipalities are answerable. Although punitive damages for prosecutorial misconduct may not be assessed against a municipality under the recent holding in *Newport v. Fact Concerts, Inc., supra,* the number of claims that may be expected would still pose a significant threat to municipalities' financial stability and consequently to their provision of important services to the public. In *Newport v. Fact Concerts, Inc.* the Court noted that, under the recent decision in *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65

L.Ed.2d 555 (1980), municipalities may be answerable for damages for federal statutory violations as well as for constitutional violations, and declined to add exposure to punitive damages to this expanding municipal liability, as to do so "may create a serious risk to the financial integrity of these governmental entities." 453 U.S. at 270, 101 S.Ct. at 2761. The Court noted that this danger outweighed the doubtful benefits of awarding punitive damages against municipalities under section 1983. *Ibid.* In the instant case, although particular awards of nonpunitive damages for prosecutorial misconduct may not financially cripple most municipalities, the potential financial impact of having to defend against significant numbers of claims and to compensate numerous successful claimants militates against holding municipal defendants answerable in the place of their prosecutorial officials. Here as in *Fact Concerts* the benefits to be anticipated from exposing municipalities to liability are not of sufficient weight to counterbalance this likely detriment.

The aims of section 1983—to compensate victims and to deter future deprivations of constitutional rights—would not be greatly impeded by extending absolute immunity for prosecutorial misconduct to municipalities. Of course the first of these aims—compensating the victim—is disserved by every application of immunity to section 1983 claims, but here as in *Imbler* "the alternative of qualifying [the] immunity would disserve the broader public interest" (424 U.S. at 427, 96 S.Ct. at 993).

As to the second aim, that of deterrence, as noted in *Imbler* both criminal and professional sanctions are available to deter prosecutorial abuses (424 U.S. at 429, 96 S.Ct. at 994). Moreover, prosecutors of conspicuous lawlessness are punishable by damage awards for unconstitutional conduct beyond the scope of "initiating a prosecution and presenting the State's case" (424 U.S. at 431, 96 S.Ct. at 995), as that phrase is defined in *Imbler* and subsequent case law. *See, e.g., Lee v. Willins, supra.* Finally, it is not clear that the assessment of an award

against their municipality would have much deterrent effect upon irresponsible individual prosecutors, who are themselves immune from liability. *Cf. Newport v. Fact Concerts, Inc., supra,* 453 U.S. 268–269, 101 S.Ct. 2760–2761, (noting that public officials may not be liable and/or able to indemnify under local law a municipality held liable for punitive damages so that "the impact on the individual tortfeasor of this deterrence in the air is at best uncertain.") Indemnification of a municipality by the tortfeasor for damages for which a prosecutorial official is personally immune under *Imbler* and *Butz* is impossible if the policy of those cases is to be applied. Thus the only deterrence to be expected from imposing liability on the municipality would not be specific to the tortfeasor but would manifest itself as a general concern common to all officials performing prosecutorial-type functions, and the more conscientious and law-respecting the official, the greater would be his or her caution to avoid conduct having potential for generation of constitutional claims. To the extent that such deterrence occurs the concern of the *Imbler* and *Butz* decisions to preserve the fearless and decisive execution of prosecutorial duties would be neglected.

■ In sum, it is necessary to conclude that the policy considerations outlined above forbid holding the municipal defendants here liable for their individual employees' acts that are within the scope of the absolute immunity accorded them by *Imbler v. Pachtman* and *Butz v. Economou.* Inasmuch as there have been alleged no acts involved that are not within the scope of such absolute immunity plaintiffs' demands against the Department of Social Services and Monroe County should be dismissed for failure to state a claim, even were there to be a sufficiently specific laying out of plaintiffs' civil rights claims.

B. *Reports to Child-Protective Agencies and Bodies*

The Complaint may be read to allege that the agents of the Department defamed James by making reports to various public and private child-protective agencies, as authorized by Article 6, Title 6 of New York's Social Services Law. Assuming the sufficiency of these allegations to state a cause of action for defamation under state law and a nexus of the alleged defamation and the parties responsible with an interference with plaintiffs' constitutionally protected familial relationship, required for purposes of section 1983 liability (*See, Paul v. Davis,* 424 U.S. 693, 708, 712, 96 S.Ct. 1155, 1164, 1165–66, 47 L.Ed.2d 405 (1976)), it must nonetheless be concluded that plaintiffs have failed to state a federal claim by said allegations.

■ It is clear that a defamation by state or municipal officials must be publicized before it can give rise to a section 1983 claim. *Codd v. Velger,* 429 U.S. 624, 628, 97 S.Ct. 882, 884, 51 L.Ed.2d 92 (1977); *Bishop v. Wood,* 426 U.S. 341, 348, 96 S.Ct. 2074, 2079, 48 L.Ed.2d 684 (1976); *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 446–447 (2d Cir.1980); *Gentile v. Wallen,* 562 F.2d 193, 197 (2d Cir.1977). Although under the law of New York *any* publication of a defamatory statement would probably satisfy that element of a tort claim for defamation (*see, Church of Scientology of California, Inc. v. Green,* 354 F.Supp. 800, 803 (S.D.N.Y.1973)), numerous United States Supreme Court decisions restricting the jurisdiction of federal courts under section 1983 to hear claims arising from state law torts committed by public officials have firmly established the principle that a greater showing of injury may be required to state a federal cause of action than for a common law tort. *Paul v. Davis, supra,* with its insistence that section 1983 must not be used to "make of the Fourteenth Amendment a font of tort law," 424 U.S. at 701, 96 S.Ct. at 1160, is itself a prime instance of these decisions. Another is *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), which held that a prisoner must allege conduct amounting to "deliberate indifference" in order to state a section 1983 claim against a prison doctor, the court observing that "[m]edical malpractice does not become a constitution-

al violation merely because the victim is a prisoner." (429 U.S. at 106, 97 S.Ct. at 292.) To the same effect is *Baker v. McCollan,* 443 U.S. 137, 146, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979), echoing *Estelle* in holding that "false imprisonment does not become a violation of the Fourteenth Amendment merely because the defendant is a state official."

■ I find that whatever else may be necessary to state a section 1983 claim for defamation by a state official, mere defamatory publication of suspicion of child neglect or abuse to agencies authorized by law to receive such reports is not sufficient publication for the purpose of stating such a claim. The United States Court of Appeals for the Second Circuit expressed an inclination toward a similar view in *Gentile v. Wallen, supra,* where the defendant school board treasurer had furnished stigmatizing information to a state unemployment office regarding the reasons for the termination of plaintiff's employment. The court suggested that as to this action "it may be that no publication was involved—only a confidential communication with an authorized governmental agency." 562 F.2d at 197–198. The court held that in any case the alleged publication did not have a sufficient temporal connection with the alteration of plaintiff's employment status to rise above simple defamation under the rule of *Paul v. Davis, supra.*

It is unclear at this point what was the temporal relationship between the reports to child protective authorities and bodies— if such reports were made—and the interference with plaintiffs' familial relationships. Assuming such reports were made, I would be reluctant to hold that because they were made later rather than sooner, or *vice versa,* they did not occur in the course of the interference with plaintiffs' familial relationships. However, as noted above, that question is not reached here in view of my decision that communications of cases of suspected child abuse or neglect to duly authorized recipients, the confidentiality of which is protected by paragraphs (4) and (10) of New York's Social Services Law § 422 (which restrict access to such reports and make the permitting or encouraging of release of such reports to unauthorized persons or agencies a class A misdemeanor), does not constitute sufficient publication to give rise to a section 1983 cause of action under the authorities discussed above. Accordingly, plaintiffs' allegations regarding the making of such reports must be dismissed for failure to state an injury cognizable under section 1983.

C. *Opposition to Plaintiffs' Attempts to Expunge Records*

■ It is plaintiffs' claim that "defendants"—presumably employees of the Department—have opposed James's efforts to have expunged all records of reports that he was suspected of sexually abusing his daughter and of court proceedings arising from those reports. Plaintiffs have asked both that this court order the expunction of all such records and that defendants be ordered to join plaintiffs' present efforts to procure such in the courts of New York. There is presently pending an appeal from the Family Court's denial of plaintiffs' request for such relief.

The alleged conduct of defendants employed by the Department in opposing expunction necessarily must have occurred *after* termination on the merits of the Family Court proceedings. Thus it could be argued that such opposition is outside the scope of the immunity enjoyed by these defendants in "initiating a prosecution and presenting the state's case" (*Imbler v. Pachtman, supra,* 424 U.S. at 431, 96 S.Ct. at 995). However, such conduct, if it occurred, must also have occurred after the termination of all state interference with plaintiffs' familial relationships. In *Gentile v. Wallen, supra,* 562 F.2d at 198, it was held that a stigmatizing communication that occurred *after* the termination of an employment relationship, and therefore lacking a significant nexus with the interference with a protected right or status, "amounted to at most the type of simple defamation that the Supreme Court held not to trigger due process rights in *Paul v. Davis, supra,* 424 U.S. at 701–10 * * * [96 S.Ct. at 1160–65]."

Therefore plaintiffs' "cause of action" for expunction does not state a federal claim under the principles announced in *Paul v. Davis, supra.* Here again, as in the cases of the other claims, plaintiffs do not point to any damage to themselves other than the potential impairment of James's reputation and standing in the community, and possible further disabilities naturally concomitant thereto. Analogizing the keeping of these records to the keeping of arrest records, it may be observed that Justice Brennan, dissenting in *Paul v. Davis,* correctly notes that the decision therein undercut the rationale of those federal cases which appeared to be developing a growing body of law pertaining to a constitutional right to the expunction of certain types of arrest records. 424 U.S. at 735 n. 18, 96 S.Ct. at 1177 n. 18. Moreover, the potential for adverse consequences to James from maintenance of the records involved here is considerably less than if they actually were arrest records. The numerous possible uses of arrest records in making judgments adverse to a former arrestee, catalogued in some of the arrest-record cases (*e.g., Menard v. Mitchell,* 430 F.2d 486, 490–491 (D.C. Cir.1970); *Morrow v. District of Columbia,* 417 F.2d 728, 742 (D.C.Cir.1969); *Bilick v. Dudlen,* 356 F.Supp. 945, 950–951 (S.D.N.Y. 1973)), are much reduced in this case where the records are maintained by specialized agencies and by the Family Court, rather than by a generalized law-enforcement agency that regularly receives inquiries as to records of applicants for positions. Moreover, the records kept by the agencies here involved are compiled and maintained pursuant to a well-considered state statutory scheme designed to advance the protection of children, set forth in New York's Social Services Law §§ 442, 424, 424a, and incorporating significant restrictions on access to reports kept in the statewide central register established thereunder. Thus strong considerations of federal-state comity militate heavily against interference on the basis of putative federal liberty guarantees. *Cf., Whalen v. Roe,* 429 U.S. 589, 603–05, 97 S.Ct. 869, 878–79, 51 L.Ed.2d 64 (1977) holding that the threat to plaintiff's reputation or freedom to seek medical treatment posed by central record-keeping of identities of patients using dangerous drugs legitimately prescribed, pursuant to a well-considered statutory scheme "evidenc[ing] a proper concern with, and protection of, the individual's interest in privacy," did not constitute an invasion of any right or liberty protected by the Fourteenth Amendment.

### III. *Claims Against the Sheriff and Employees*

#### A. *Defamation*

##### 1. *Generally*

██ Most of plaintiffs' such claims are in the nature of charges that the defendants have defamed plaintiffs through the publication of information related to the suspicion that James had molested his daughter. To the extent that these charges are made against defendants employed by the Sheriff, they include allegations that one or more of those defendants made defamatory communications to James's employer, to the public media, to private and/or governmental agencies and in the course of a state tort lawsuit brought by James against Yazback and the Sheriff.

According the best possible view to plaintiffs' claims along these lines, the greatest injury that plaintiffs have endured is possible damage to James's reputation and standing in the community, impairment of his prospects for advancement in his employment and, conceivably, even a threat to James's continued employment. However, plaintiffs have not claimed an actual injury to or alteration of James's employment status or employability, but only that the alleged publications were made with the *intent* to cause such injury. Complaint, ¶ XXXVI. Moreover, it appears that James has actually received a promotion since the allegedly defamatory publications. First Answering Affidavit of Edwin R. Schulman, attorney for plaintiffs, Exhibit A, at 30–31. Upon such claimed injuries a federal cause of action for defamatory conduct cannot be erected.

"[I]n any § 1983 action the initial inquiry must focus on whether the two essential elements to a § 1983 action are present; (1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981). Taking the first of these elements as established, the focus is on the satisfaction *vel non* of the second element. In order to establish a section 1983 claim based upon defendants' alleged defamatory communications, plaintiffs must establish deprivation of a property or liberty interest protected by the Fourteenth Amendment. Plaintiffs have not alleged direct impairment of any such property interest. James has no claim of entitlement to continuance or advancement in the service of his private employer, such that a protected property interest in the same can be recognized in a section 1983 action.

> "[T]here appears to be general agreement that a property interest arises only when an individual possesses 'a legitimate claim of entitlement' to continued job tenure. [*Board of Regents v. Roth,* 408 U.S. 564,] 577 [92 S.Ct. 2701, 2709, 33 L.Ed.2d 548] [ (1972) ]. The requisite origin of this 'entitlement' is unsettled, but it apparently must arise from 'existing rules or understandings that stem from an independent source such as state law.' *Id.*" *Quinn v. Syracuse Model Neighborhood Corp., supra,* 613 F.2d at 447.

Plaintiffs have not pointed to any independent rules or understandings constituting James's employment-related concerns as "property" for Fourteenth Amendment purposes. Moreover, as already noted, James has not lost his employment because of the alleged communications, but has in reality been advanced therein. Consequently, if there are any, "the depriva-

tions—loss of future salary increments and potential for professional advancement—are speculative or *de minimis*" (*Woods v. State,* 469 F.Supp. 1127, 1133 (S.D.N.Y.), aff'd, 614 F.2d 1293 (2d Cir.1979)), and fall short of due process protection for that reason, whether James's interest in his employment status is analyzed under either "property" or "liberty" principles.

As regards a possible liberty interest in plaintiff's reputation and standing in the community, *Paul v. Davis, supra,* established that defamation is not actionable under the Fourteenth Amendment and section 1983, absent deprivation of some right positively "vouchsafed * * * by the State." 424 U.S. at 712, 96 S.Ct. at 1166. James's employment interests do not rise to this level, and plaintiffs do not allege any other qualifying deprivations flowing from the alleged defamations. The possibility that the alleged defamations forced plaintiffs to sell their home and purchase another (Complaint, ¶ LXV) has not been shown to implicate a due process right, particularly inasmuch as plaintiffs have not alleged a property *loss* resultant or attendant. Moreover, it is assumed that such relatively remote consequences of defamation were considered by the Court in deciding *Paul v. Davis, supra,* when it ruled defamatory publications beyond the pale of due process protection, "however seriously they may have harmed [a person's] reputation" (424 U.S. at 712, 96 S.Ct. at 1166). The same might be said of the possibility that the alleged defamations resulted in "psychological and psychiatric damage" to James and Kathleen (Complaint, ¶ LXVI.)[10] Moreover, the averment of psychological damage is so conclusory and devoid of factual substantiation as not to state a claim for that reason alone. *See Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d Cir.1977); *Koch v. Yunich, supra,* 533 F.2d at 85–86; *Fine v. City of New York,* 529 F.2d 70, 73 (2d Cir.1975).

**10.** Negligent or intentional infliction of emotional distress has been held not to state a claim under section 1983, in order to avoid making the Fourteenth Amendment "a font of

tort law" (*Paul v. Davis, supra,* 424 U.S. at 701 [96 S.Ct. at 1160] ). *Brainerd v. Potratz,* 421 F.Supp. 836, 840 (N.D.Ill.1976), aff'd, 566 F.2d 1177 (7th Cir.1977).

Nor are the alleged defamations boosted to a cognizable due process claim even if they were made maliciously, as plaintiffs assert. Even malicious actions do not expose the actor to section 1983 liability unless a recognizably protected federal interest is violated. *Bishop v. Wood*, 426 U.S. 341, 349 n. 13, 96 S.Ct. 2074, 2080 n. 13, 48 L.Ed.2d 684 (1976) ("[T]he impact on petitioner's constitutionally protected interest in liberty is no greater even if we assume that the [respondent] deliberately lied."). *Cf. Cook v. Brockway*, 424 F.Supp. 1046, 1053 (N.D.Tex), *aff'd*, 559 F.2d 1214 (1977).

### 2. Defamatory Publications in State Judicial Proceedings

While good faith representations made by defendants in plaintiffs' state civil suit against them would be protected by immunity against a section 1983 claim (*Gentile v. Wallen, supra,* 562 F.2d at 198), plaintiffs claim that defendants have made defamatory accusations and innuendoes with malice and full knowledge of their falsity. Nonetheless the wrong alleged has not been shown to have violated any liberty or property interest recognizable as protected under *Paul v. Davis, supra.* In *Gentile v. Wallen* the plaintiff claimed that stigmatizing information was disclosed in the course of litigation regarding her discharge from public employment—clearly a charge implicating the constitutional due process guarantee under *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). However, the court's analysis and application of the good faith immunity for stigmatizing communications in judicial proceedings (562 F.2d at 198) clearly and correctly was premised upon the proposition that even such communications made in bad faith would support a section 1983 claim only if a protected interest were thereby infringed. Accordingly plaintiffs fail to state a section 1983 claim upon defendants' alleged defamations in the state court civil suit against them for the same reasons applied above to defendant's alleged defamatory communications to James's employer, the media and various agencies.[11]

*Owen v. City of Independence, supra,* does not stand for the proposition that defamation by public officials standing alone can give rise to a section 1983 claim, as plaintiffs contend. Rather, the valid constitutional claim there involved was that the defamation was publicized in connection with the termination of employment (445 U.S. at 631–632, 100 S.Ct. at 1405–1406; decision below, 560 F.2d 925, 936–937 (8th Cir.1977)), an exception to the rule of *Paul v. Davis, supra,* clearly recognized by the opinion therein (424 U.S. at 710, 96 S.Ct. at 1164–1165).

If the alleged defamatory publications under consideration had been made in connection with an interference with plaintiffs' family life, there would perhaps be implicated a liberty interest so as to make the defamations actionable under section 1983. *See Paul v. Davis, supra,* 424 U.S. at 710–711, 96 S.Ct. at 1164–1165. However, notwithstanding the indiscriminate allegations of plaintiffs' Complaint, it is apparent from a review of the numerous affidavits and exhibits submitted by both sides on this motion that the agents or employees of the Department were alone responsible for procuring the preliminary protective orders in Family Court that led to the disruption of plaintiffs' familial relationships. Thus, if the alleged defamatory conduct by the Sheriff and his employees did occur, the Complaint suggests no causal or other relationship of such conduct with the removal of Maura from her home sufficient to implicate federal guarantees. *Paul v. Davis, supra,* requires that a defamation under color of state law must be made "in the course of" the interference with a protected interest, or that such interference occur "as a result of the state action" (424 U.S. at 710,

---

11. If the state court action were premised entirely upon charges of defamation, as is suggested by certain nonevidentiary submissions of the parties on the instant motion, then an absolute privilege attaches to any courtroom statement made therein and relevant to the proceeding, as well as to the briefs and pleadings. *See Imbler v. Pachtman, supra,* 424 U.S. at 426 n. 23, 96 S.Ct. at 993 n. 23.

711, 96 S.Ct. at 1164, 1165), if the defamation is to be actionable under section 1983. There has been no showing and not even an allegation of a link of this nature between the alleged defamatory police conduct and the interference with plaintiffs' familial relationships.

Accordingly, plaintiffs have failed to state a cause of action based upon alleged defamatory conduct by the employees of the Sheriff.[12] Plaintiffs' arguments as to the liability for such conduct of the Sheriff and the County under *Monell v. New York City Department of Social Services, supra,* are of no consequence.

### B. *Invasion of Privacy*

A final claim against certain employees of the Sheriff, raised by paragraph XXXII of the Complaint, and not yet disposed of, is that

> "[u]pon information and belief, the Defendants fabricated lie detector results during the course of their investigation and commencement and continuation of Court proceedings and attempted to obtain from Plaintiff James Whelehan a confession as to alleged misdeeds and compelled the adult Plaintiffs to divulge items of a private nature about themselves which the Plaintiffs had no rightful reason to have to divulge to any person."

As suggested by several submissions of defendants derived from proceedings in the pending state court action, the only apparent reference is to happenings in the course of a polygraph test administered by several Deputy Sheriffs at the request of James, in which James made disclosures concerning his sexual conduct, and during which the defendants may have used techniques such as badgering, or telling James that he was failing the test, in order to obtain admissions. See Examination Before Trial of

James Whelehan, in *Whelehan v. Yazback, et al.,* Exhibit A attached to defendants' Notice of Motion; Examinations Before Trial of Ronald Giacobbe, Russell Coon, Leon Hill and Philip Knight, in *Whelehan v. Yazback, et al.,* Exhibits A and B attached to defendants' Reply Affidavit. Plaintiffs themselves have alleged no concrete factual basis for the assertions.

 Under certain circumstances, being compelled to disclose information about one's personal life might constitute an invasion of privacy actionable under section 1983. *See, e.g., Whalen v. Roe, supra,* 429 U.S. at 599, 97 S.Ct. at 876; *Lora v. Board of Education of City of New York,* 74 F.R.D. 565, 570–571 (E.D.N.Y.1977). However, the contours of the law of the constitutional right to privacy are far from clearly mapped, requiring case-by-case determination of the degree to which particular intrusions on privacy interests, loosely so-called, encroach or impinge upon "fundamental personal rights directly secured by the Constitution" (*Crain v. Krehbiel,* 443 F.Supp. 202, 209 (N.D.Cal.1977)).

There is nothing in plaintiffs' allegations which enables me to make such a determination, nor is there any pertinent factual supplementation in the affidavits submitted by plaintiffs on the instant motion. Plaintiffs do not say precisely which of the defendants invaded their privacy, nor do they allege the means by which the allegedly compelled disclosures were procured. To the extent to which disclosures of a personal nature are voluntary there is no state action, therefore compulsion or coercion by the state is a necessary element of any constitutional privacy invasion claim. Nor do plaintiffs allege the nature of the disclosures made.

 The bare allegations of paragraph XXXII of the Complaint are insufficient to

---

**12.** After the submission of this motion, plaintiff James Whelehan filed in this court a Notice of Partial Dismissal consenting to discontinuance of his action herein against Yazback to the extent that such action is identical to James's pending state court defamation lawsuit against Yazback and the Sheriff. In view of my hold-

ing that all plaintiffs fail to state a section 1983 cause of action for defamation against any employee of the Sheriff, which precludes entertainment of any pendent state law defamation claims, I need not consider any implications of this consent to partial dismissal.

withstand a motion to dismiss, under the salutory rule adopted by the United States Court of Appeals for the Second Circuit that "[c]omplaints relying on civil rights statutes are plainly insufficient unless they contain some specific allegations of fact indicating a deprivation of civil rights, rather than state simple conclusions." *Koch v. Yunich, supra,* 433 F.2d at 85.[13]

Accordingly, the allegations in the nature of a claim of a violation of constitutionally protected privacy interests must be dismissed, without prejudice.

Further, if the factual basis for this attempted claim is that which appears in the several above-cited examinations before trial submitted by defendants (which are not in a form entitling them to consideration as evidence on defendants' motion for summary judgment), the claim could not withstand a motion for summary judgment. Review of these submissions indicates that James was very willing to disclose information concerning his personal habits and conduct, motivated as he evidently was by a sincere desire to suggest plausible explanations for the evidentiary basis of the suspicion he was under and thereby to vindicate himself. It is certain that, under the facts as they appear in those depositions, had a confession been procured as a result of the police conduct involved, a man of James's age, education and experience could not successfully claim coercion under the traditional "totality of all the circumstances" test for coerced confessions. *See, Procunier v. Atchley,* 400 U.S. 446, 453, 91 S.Ct. 485, 489, 27 L.Ed.2d 524 (1971).

Although James would undoubtedly have been acting under a natural desire to retain custody of his infant daughter (*cf., Lynumn v. Illinois,* 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963)), the implicit threat or perhaps more properly the risk of her removal was from a source acting independently of the officers who examined James —namely, the Department and its employees—and would have been very much on the mind of a man of James's qualifications and predicament regardless whether the po-lice suggested that possible consequence in the course of an examination. In fact James did not confess but complains now only that he was compelled to divulge sensitive private information. The situation therefore in regard to the risk of his daughter's removal is analogous to that of a person who discloses personal secrets in an attempt to establish an alibi, fully conscious that failure to do so may lead to incarceration. Therefore the risk of removal, even if made explicit by the examining officers, cannot be regarded as coercive because it existed as an ordinary and clearly apparent consequence of James's failure to establish his innocence.

## IV. *Sufficiency of Service of Process*

There remains only the matter of the sufficiency of the service of process upon defendant Epstein. Plaintiffs admit that as of March 27, 1981, the date of their attorney's reply affidavit, personal or substituted service had not been made upon Epstein. Plaintiffs have made no subsequent showing that sufficient service has been made. However, inasmuch as the foregoing considerations would dictate dismissal of plaintiffs' claims against this defendant, this action must be dismissed as to him even if he has been or should be subsequently served and even if a dismissal for failure to prosecute would not be in order.

## CONCLUSION

In accordance with the foregoing, it is concluded that plaintiffs have not succeeded in stating a federal cause of action upon any of their numerous claims. Therefore defendants' motion to dismiss hereby is ORDERED granted. This order is without prejudice to any motion by plaintiffs for leave to file and serve an amended complaint setting forth substantial facts showing the occurrence of constitutional violations, but such relief will be considered only as to those aspects of plaintiffs' Complaint that are hereby dismissed *solely* due to the factual sparsity of the pertinent allegations.

---

**13.** See footnote 5, *supra.*