**John HODOROWSKI and Jeraldine Hodorowski, et al., Plaintiffs-Appellees,**

v.

**Ann RAY, Mary Ellen Burns and Texas Department of Human Resources, Defendants-Appellants.**

No. 87-1696.

United States Court of Appeals, Fifth Circuit.

May 18, 1988.
Rehearing Denied June 14, 1988.

---

Robert Ozer, Asst. Atty. Gen., Austin, Tex., for defendants-appellants.

Frederic M. Wolfram, Amarillo, Tex., for Hodorowski, et al.

Before THORNBERRY, WILLIAMS, and DAVIS, Circuit Judges.

THORNBERRY, Circuit Judge:

The question presented by this appeal is whether and to what extent Texas child protective service workers are immune from liability under 42 U.S.C. § 1983 for their decision to remove children from the home of their parents without a prior court order. The district court held that the workers could claim neither absolute nor qualified immunity. We reverse, holding that the workers may claim qualified, but not absolute, immunity.

## I.

The following facts are not in dispute. On Thursday, November 4, 1982, at 4:15 p.m., an anonymous informant told the Texas Department of Human Services (TDHS) that John Hodorowski was chasing his two seven-year-old daughters with a chain in the front yard of their Amarillo, Texas home. The TDHS classified the information as a "type II complaint," not requiring immediate response. As a result, nothing was done until 9:00 a.m. the next day, when two TDHS investigators arrived at the Hodorowski home to investigate the complaint. The two children, who were alone, let in the investigators. The investigators saw bruises on exposed parts of one child's body, and one child told them that there were more severe bruises. Nevertheless, an investigator conceded that neither child showed an obvious need of emergency medical care. The investigators took the children to the TDHS offices, where their bruises were photographed. Later in the morning, another TDHS worker took the children to the hospital, where a doctor examined them and a policeman photographed more bruises. John Hodorowski now admits that he caused the children's bruises.

The TDHS workers never obtained a court order authorizing the removal of the Hodorowski children. The TDHS says that it attempted to obtain an emergency ex parte court order under Tex.Fam.Code Ann. § 17.02 on Friday, the day it took possession of the children, but claims that the court could not schedule a hearing. The children consequently remained in the possession of the TDHS without court order until Monday, November 8, when the TDHS filed a Suit Affecting the Parent-Child Relationship. Tex.Fam.Code.Ann. § 17.03(b). After a court hearing that day, the parties agreed that the children would return home, but that for thirty days the TDHS would be Managing Conservator of the children and the parents would obtain counseling and refrain from corporal punishment.

The Hodorowskis, individually and as next friends and parents of their children, filed this suit against several TDHS officials, the informant, several City of Amarillo officials, the Amarillo Police Department, and the Amarillo Hospital District. They asserted claims under 42 U.S.C. § 1983 and related statutes for interference with family integrity in violation of the fourteenth amendment. All defendants filed motions to dismiss based on a stipulated statement of facts. The motion of appellants Ray and Burns, the TDHS workers, asserted the defenses of absolute and qualified immunity. The district court in a written order granted the other defendants' motions, but denied the motion of Ray and Burns. Ray and Burns immediately brought this appeal pursuant to *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985) (holding that a denial of a claim of qualified immunity is an appealable "final decision"). The district court has stayed proceedings during the pendency of this appeal.

## II.

Although 42 U.S.C. § 1983 ostensibly imposes liability on "every person" who, under color of state law, deprives another of a constitutional right, the courts have long recognized that certain individuals, as a consequence of their function, merit absolute immunity to section 1983 for actions within the scope of that function. *See, e.g., Tenney v. Brandhove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951) (state legislators); *Pierson v. Ray*, 386 U.S. 547, 554–55, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967) (judges); *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (prosecutors); *Nixon v. Fitzgerald*, 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982) (the President); *Briscoe v. LaHue*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983) (witnesses). Absolute immunity is much broader than the more common qualified immunity. "Qualified immunity shields only that conduct not violative of clearly established constitutional rights of which a reasonable person would have known. Absolute immunity, in contrast, precludes any action for damages, so long as the challenged conduct falls within

the scope of the immunity." *Austin v. Borel,* 830 F.2d 1356, 1358 (5th Cir.1987) (footnote omitted). If applied in this case, therefore, absolute immunity would preclude section 1983 liability even if the TDHS workers knew or should have known that they were violating the children's rights when they took possession of the children.

The Supreme Court's inquiry in the absolute immunity cases "was predicated upon a considered inquiry into the immunity historically accorded the relevant official at common law and the interests behind it." *Imbler,* 424 U.S. at 421, 96 S.Ct. at 990. The reason for this historical inquiry was the Court's desire to read section 1983 "in harmony with general principles of tort immunities and defenses rather than in derogation of them." *Id.* at 418; 96 S.Ct. at 989. Prosecutors, for example, were absolutely immune from tort liability at common law. *See id.* at 421–22, 96 S.Ct. at 990–91. The reasons for that common-law immunity "include concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust." *Id.* at 423, 96 S.Ct. at 991. Because the Court thought that exposure to section 1983 liability raised the same concerns for prosecutors as exposure to common-law tort liability, it held that, "in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983." *Id.* at 431, 96 S.Ct. at 995. The Court was careful to note, however, that its analysis focused on the prosecutor's function, not on the prosecutor's mere status: "We have no occasion to consider whether like or similar reasons require immunity for those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of advocate." *Id.* at 430–431, 96 S.Ct. at 995.

## A. Prosecutorial Immunity

█ Officials with functions analogous to those of prosecutors have been accorded absolute immunity. In *Butz v. Economou,* 438 U.S. 478, 515–17, 98 S.Ct. 2894, 2915–16, 57 L.Ed.2d 895 (1978), for example, the Court extended prosecutorial immunity to executive branch officials charged with initiating and conducting administrative proceedings against individuals or corporations. Because these functions were sufficiently similar to the functions of prosecutors, the officials exercising them deserved absolute liability. *Id.* Appellants argue first that, like such administrative officials, TDHS child protective service workers are similar enough in function to prosecutors that they should be given absolute immunity.

At least three other circuits have applied an *Economou*-like analysis in according absolute immunity to state child care social workers. *Meyers v. Contra Costa County Department of Social Services,* 812 F.2d 1154 (9th Cir.1987) held that a California social worker was absolutely immune from section 1983 liability for his actions in initiating dependency proceedings against a parent suspected of abusing his child. The court reasoned:

> Although child services workers do not initiate criminal proceedings, their responsibility for bringing dependency proceedings, and their responsibility to exercise independent judgment in determining when to bring such proceedings, is not very different from the responsibility of a criminal prosecutor. The social worker must make a quick decision based on perhaps incomplete information as to whether to commence investigations and initiate proceedings against parents who may have abused their children. The social worker's independence, like that of a prosecutor, would be compromised were the social worker constantly in fear that a mistake could result in a time-consuming and financially devastating civil suit.

*Id.* at 1157. Also, *Malachowski v. City of Keene,* 787 F.2d 704 (1st Cir.1986) accorded absolute immunity to a city juvenile officer accused of filing an allegedly false delinquency petition. The court held that the "filing of the petition . . . was not an 'inves-

tigative' activity, but rather an activity 'intimately associated with the judicial phase of the criminal process ... to which the reasons for absolute immunity apply with full force.'" *Id.* at 712 (citing *Imbler,* 424 U.S. at 430, 96 S.Ct. at 995). Finally, *Kurzawa v. Mueller,* 732 F.2d 1456 (6th Cir. 1984) accorded absolute immunity to state social workers, state psychologists and psychiatrists, and an appointed guardian ad litem, charged with improperly beginning court proceedings in an effort to remove a child from the custody of his parents. Citing *Briscoe v. LaHue,* 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983), the court held that the defendants, like prosecutors, were integral parts of the judicial process, and thus should have absolute immunity.

In *Austin v. Borel,* 830 F.2d 1356 (5th Cir.1987), however, this court declined to accord absolute immunity to Louisiana child protective service workers. We acknowledged that *Meyers, Malachowski,* and *Kurzawa* had reached a different result with regard to social workers in other states, but we thought that those cases should be distinguished because of the differing actions of the social workers that were at issue. In all three cases from the other circuits, "the immune conduct was the initiation of judicial proceedings" by the defendants. *Id.* at 1360. In the *Austin* case, however, the challenged conduct was not the initiation of judicial proceedings, which is done under Louisiana law by the filing of a petition, but the filing of an allegedly false verified complaint.

> [A] verified complaint serves a function wholly distinct and different from that of a petition. A verified complaint is a sworn statement of fact by "a peace officer, probation officer, district attorney, or other person designated by the court" indicating the existence of reasonable grounds to believe a child should be taken into custody.

*Id.* at 1361 (footnotes omitted). The filing of a verified complaint under Louisiana law was, we therefore held, analogous to a probation officer's filing of a probation report that causes the arrest of a person on probation. *Id.* at 1362. In such circumstances, probation officers are not entitled

to absolute immunity. *Galvan v. Garmon,* 710 F.2d 214, 215 (5th Cir.1983), *cert. denied,* 466 U.S. 949, 104 S.Ct. 2150, 80 L.Ed. 2d 536 (1984). We therefore concluded that Louisiana social workers likewise are not absolutely immune from liability for filing a verified complaint. *Austin,* 830 F.2d at 1362.

We think that the challenged conduct in the present case, like that in *Austin,* is sufficiently removed from the judicial process so that the appellants are not entitled to absolute immunity. The Hodorowskis do not challenge the initiation of judicial proceedings with the filing of the lawsuit on Monday, November 8, 1982. Instead, they challenge the TDHS's seizure of the children without a court order on Friday, November 5, 1982. Such seizures are authorized by the Texas Family Code if a reasonable person would believe that "there is an immediate danger to the physical health or safety of the child and ... there is no time to obtain a temporary restraining order or attachment." Tex. Fam.Code.Ann. § 17.03(a)(4). Nevertheless, seizure without a court order in the face of an immediate danger seems to us more akin to the function of police than prosecutors. Policemen, not prosecutors, investigate dangerous situations and are charged with the duty, if necessary, to intervene to prevent injury. But policemen, like most other executive officials, are ordinarily not protected by absolute immunity, *Pierson v. Ray,* 386 U.S. 547, 555, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967), unless they are engaged in a function integral to the judicial process, such as testifying as witnesses, *Briscoe v. LaHue,* 460 U.S. 325, 335–36, 103 S.Ct. 1108, 1115–16, 75 L.Ed.2d 96 (1983). Because the appellants' actions in taking possession of the children were not integral to the judicial process, we hold that they may not claim prosecutorial immunity. *See also Robison v. Via,* 821 F.2d 913, 918–19 (2d Cir.1987) (declining to grant prosecutorial immunity to child abuse investigators because the investigation of child abuse and the seizure of children are essentially police functions,

and thus not " 'intimately associated with the judicial phase' of the matter").

### B. Child Abuse Investigation Immunity

■ Appellants note that several district courts have granted absolute immunity to child protective service workers not because of any analogy to prosecutors but for policy reasons. *See, e.g., Mazor v. Shelton,* 637 F.Supp. 330 (N.D.Cal.1986); *Hennessey v. Washington, Department of Social and Health Services,* 627 F.Supp. 137 (E.D.Wash.1985); *Whelehan v. County of Monroe,* 558 F.Supp. 1093 (W.D.N.Y. 1983). These courts have concluded that absolute immunity is necessary to allow for proper investigation and intervention in cases of suspected child abuse. Appellants argue that we should follow these decisions and, for the same reasons, grant absolute immunity to child protective service workers engaged in all aspects of the investigation of complaints of child abuse.

The Supreme Court, however, has hesitated to extend absolute immunity beyond the common-law tort immunities that existed when section 1983 was enacted in 1871. *Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 1097, 89 L.Ed.2d 271 (1986) ("We reemphasize that our role is to interpret the intent of Congress in enacting § 1983, not to make a free-wheeling policy choice...."). Appellants can cite no authority that the seizure of children without a court order was, in 1871, accorded absolute immunity at common law. Without such a basis in common law, courts should grant absolute immunity

> only if [a defendant] were able to show that the function at issue is "so sensitive as to require a total shield from liability," *Harlow v. Fitzgerald,* 457 U.S. 800, 812–13, 102 S.Ct. 2727, 2735, 73 L.Ed.2d 396 (1982), and that absolute immunity is "essential" if that function is to be properly performed, *Butz v. Economou,* 438 U.S. 478, 506–07, 98 S.Ct. 2894, 2910–11, 57 L.Ed.2d 895 (1978).

*Robison v. Via,* 821 F.2d 913, 919 (2d Cir. 1987). Our review of the district court decisions, however, has not persuaded us that absolute immunity is necessary to the effective functioning of the child abuse investigation system.

In *Mazor v. Shelton,* 637 F.Supp. 330 (N.D.Cal.1986), a mother brought a section 1983 claim against California and Nevada social workers for removing her son from her custody without a prior hearing and without her knowledge or consent. The court held that the state workers were entitled to absolute immunity. The court noted that state social workers perform several different duties, including investigating suspected child abuse, filing court proceedings, and taking children into "temporary or protective custody." *Id.* at 334. The court said, however, that even the immediate decision to remove a child from the home ought to be protected by absolute immunity:

> If courts allow retaliatory suits, social workers would be inclined to act only in cases in which they are absolutely certain that the alleged conduct occurred. But absolute certainty is not always available in situations where the circumstances require an immediate decision to remove a child from a home. Without the benefit of immunity, social workers' attention would shift from protecting abused or neglected children to avoiding vexatious litigation. This shift could threaten the health and safety of an abused or neglected minor.

*Id.* at 334–35.

Similarly, in *Whelehan v. County of Monroe,* 558 F.Supp. 1093 (W.D.N.Y.1983), the court dismissed on the ground of absolute immunity a section 1983 claim against several county employees charged with reporting erroneous information that led to the temporary removal of a child from his father's custody. The court compared the sensitive decisions that a child protective service worker must make to those a prosecutor must make. *Id.* at 1099. The court concluded that, like prosecutors, such workers needed absolute immunity to prevent malicious retaliatory actions and the consequent diversion of energy from the workers' duty to protect children. *Id.; see also Hennessey v. Washington, Department of Social and Health Services,* 627

F.Supp. 137, 140 (E.D.Wash.1985) (expressly adopting *Whelehan*'s reasoning).

Despite the reasoning of these cases, we think that appellants have not met the burden of showing that absolute immunity is essential to the proper functioning of child protective service workers. First, although protecting children from child abuse is an important governmental function, it is no more vital than other functions, such as the Attorney General's national security role and police efforts to capture felons, for which absolute immunity has been denied. *See Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). More importantly, we note that qualified immunity protects executive officials as long as their actions do not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). This more limited immunity provides "ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley*, 106 S.Ct. at 1096. In child abuse investigations, state workers must maintain a delicate balance between the family's right to privacy and the state's interest in discovering and preventing child abuse. Though we do not wish to restrict unduly the scope of child abuse investigations, we also do not wish to impinge on the "most essential and basic aspect of familial privacy—the right of the family to remain together without the coercive interference of the awesome power of the state." *Duchesne v. Sugarman*, 566 F.2d 817, 825 (2d Cir.1977). We think that qualified immunity, not absolute immunity, strikes the better balance between these concerns. As the Second Circuit has observed in reaching the same result in these circumstances,

> [W]e think the strong emotional response provoked in anyone hearing an allegation of child abuse counsels against according an official absolute immunity for a taking in the wake of any and every such allegation, lest the official power itself become more likely to be abused. Nor could we rule that absolute immunity for

taking the child is appropriate when done in response to a complaint that is credible or in circumstances that bespeak emergency, for the very introduction of such circumstantial qualifiers leads us out of the realm of absolute immunity, in which evaluation of motive and reasonableness is forbidden, and into the realm of qualified immunity.

*Robison v. Via*, 821 F.2d 913, 920 (2d Cir. 1987). We agree with the Second Circuit, and therefore decline to extend absolute immunity to all phases of the investigation of child abuse complaints.

### III.

■ In contrast with absolute immunity, qualified immunity is generally accorded to most executive officials. It is an accommodation by the courts to the "conflicting concerns" of, on one hand, government officials seeking freedom from personal monetary liability and harassing litigation and, on the other hand, injured persons seeking redress for the abuse of official power. *Anderson v. Creighton*, —— U.S. ——, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). The accommodation "provid[es] government officials performing discretionary functions with a qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Id.* In concrete terms, "whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action ... assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 819, 102 S.Ct. 2727, 2738, 2739, 73 L.Ed.2d 396 (1982)).

■ An important consideration in deciding whether an official violated clearly established law is the generality of the statement of the relevant rule. As the Court in *Anderson* observed, many general constitutional rights, such as the right to due process of law, are clearly established and yet so general that it often will be unclear

whether particular conduct violates the right. 107 S.Ct. at 3038–39. For that reason, "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 3039.

■ The district court held that appellants were not protected by qualified immunity because they violated the clearly established right of "family integrity." [1] We think that the district court's formulation of the right was too general. It is beyond dispute that many aspects of family integrity possess constitutional stature. But reasonable government officials, knowing only that they must not infringe on family integrity, would not necessarily know just what conduct was prohibited. In particular, in the absence of any more fact-specific authority, we do not think that appellants in this case should have known that their conduct in removing the Hodorowski children from the home violated the nebulous right of family integrity.

The two cases cited by the district court as clearly establishing the right of family integrity highlight the unsuitability of such a general right to fix liability in particularized circumstances. *Santosky v. Kramer,* 455 U.S. 745, 747–48, 102 S.Ct. 1388, 1392, 71 L.Ed.2d 599 (1982) held that a state could not "sever completely and irrevocably the rights of parents in their natural child" unless the state established by clear and convincing evidence that the child was "permanently neglected." And, *Stanley v. Illinois,* 405 U.S. 645, 649, 92 S.Ct. 1208, 1211, 31 L.Ed.2d 551 (1972) held that due process required a hearing before the state could permanently terminate the parental rights of unmarried fathers. It is undeniable that concern for family integrity figured prominently in the Court's rationale in

both cases. *See Santosky,* 455 U.S. at 753, 102 S.Ct. at 1894 (noting "this Court's historical recognition that freedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment"); *Stanley,* 405 U.S. at 651, 92 S.Ct. at 1212 ("The Court has frequently emphasized the importance of the family. The rights to conceive and to raise one's children have been deemed 'essential,' 'basic civil rights of man,' and '[r]ights far more precious than property rights.'" (citations omitted)). But it would be a mistake to conclude that, from *Santosky* and *Stanley* alone, the appellants should have known that taking the Hodorowski children into temporary custody violated a constitutional right. Both cases, for example, involved the state's attempt to sever *permanently* the parent-child relationship. The present case, by contrast, concerns an attempt to obtain only *temporary* custody of the children. This difference alone is sufficient to prevent us from concluding that appellants' conduct violated clearly established law.

When the TDHS workers arrived at the Hodorowski home, they knew of the report that, the previous evening, the father had chased the children in the yard with a chain. They saw confirmation of the report in the children's bruises, and in the children's statement that other more serious bruises were concealed under their clothing. Though the children did not appear to need emergency medical treatment, the workers could not be sure when the father would return and perhaps threaten the children again. In these circumstances, we think that appellants' actions in temporarily removing the children from the home were objectively reasonable, and as a matter of law violated no clearly established right.

## IV.

For the above reasons, we conclude that qualified immunity shields appellants from

1. The district court also concluded that no "immediate danger" existed, as defined by Tex.Fam. Code Ann. § 17.03, to justify the taking of the children. We need not address that state law conclusion, because appellants' actions were clearly not "so far removed from the ordinary course of [their] duties ... that [they could not] establish their entitlement to claim immunity in the first instance." *Saldana v. Garza,* 684 F.2d 1159, 1164 n. 17 (5th Cir.1982) (quoting *Barker v. Norman,* 651 F.2d 1107, 1121 n. 18 (5th Cir. Unit A 1981)).

liability in this case. The district court's order denying appellants' motion to dismiss is therefore

REVERSED.