UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 94-11090
_____

CHARLES KISER, JR., and
CODY KISER,

Plaintiffs-Appellants,

versus

PAM GARRETT, ET AL.,

Defendants,

PAM GARRETT, ET AL.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Texas

_____

October 19, 1995

Before BARKSDALE, BENAVIDES, and STEWART, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

This action arises out of a child being temporarily removed from his home during an investigation of possible child abuse; at issue is a summary judgment dismissing substantive and procedural due process claims, springing from a claimed liberty interest in living peaceably in a family, against several members of the Texas Department of Human Services (DHS).[1]   Because the claimed

_____

[1]   The appellees are: case workers Pam Garrett and Teri Green, DHS supervisor Nora Stinson, DHS investigator Arthur Bussey, and DHS Director of Child Protective Services Otis Dalton.   In September 1993, the child protective services functions of DHS were

constitutional rights were not clearly established at the time in issue, the appellees are shielded by qualified immunity. Therefore, we **AFFIRM**.

I.

Before 7:00 a.m. on November 14, 1991, Charles Kiser, Jr., (Kiser) took his ten-week-old son, Cody, to the child's regular sitter, Esperanza Bravo, who operated a DHS registered day-care facility; Cody had been in day-care there for about a month.[2] Later that morning, at approximately 10:45, Kiser picked up Cody from the Bravo home for a scheduled medical appointment, arriving at Dr. Herbert's office approximately 15 minutes later. Dr. Herbert examined Cody and prescribed medication for an ear infection, but noted no distress or other evidence of injury.[3] Kiser then returned Cody to the Bravo home (around noon).

At approximately 2:00 p.m. that day, Cody's mother picked him up from the Bravo home. When they reached home about ten minutes later, Cody seemed upset; his mother discovered that his right arm was swollen. She took Cody to Dr. Schultz, who diagnosed a fresh

transferred to the Texas Department of Protective and Regulatory Services.

[2]    Bravo's facility had been registered with DHS at least since 1982, and was listed in a public registry of such facilities which DHS made available to parents seeking such facilities for their children. Kiser alleged in the complaint and response to the summary judgment motion that, in reliance on the DHS registry, the Bravo home had been selected.

[3]    The appellees note that the doctor's failure to observe signs of distress or injury does not mean necessarily that Cody was not injured at that time, because Dr. Herbert held Cody by his clothing during the examination.

fracture of Cody's right forearm. Cody was admitted to the hospital for evaluation and treatment; x-rays revealed evidence of a partially healed prior fracture of his left arm, and an injury to his left leg.[4]

On November 15, as required by Texas law, Dr. Schultz reported, to DHS, Cody's unexplained injuries, which suggested the possibility of abuse. Appellee Stinson assigned appellee Garrett to conduct an investigation. Garrett interviewed Dr. Schultz, who, according to Garrett's affidavit, stated that the cause of the fracture was consistent with a severe blow, rather than as a result of someone pulling on Cody's arm.[5]

Garrett interviewed the Kisers at the hospital, and advised them that an ex parte court hearing was scheduled later that afternoon regarding temporary custody. After the hearing, Garrett took physical custody of Cody pursuant to a court order granting DHS temporary protective custody pending an investigation into the causes of Cody's injuries. Cody was placed in a foster home after his release from the hospital.[6]

_____

[4]    Kiser was an enlisted member of the Air Force. The Air Force investigative report, submitted by Kiser in response to the summary judgment motion, states that Cody's x-rays were reviewed by three specialists, who discovered two more injuries, and who opined that the injuries were the result of physical abuse.

[5]    Kiser's affidavit states that Garrett interviewed Mrs. Kiser and her two children on November 15, and that Mrs. Kiser's daughter, using a doll, showed Garrett how Mrs. Bravo picked Cody up by one arm. Kiser states further that, at a court hearing on December 10, Dr. Herbert demonstrated to the judge how a child's arm could be broken by lifting the child by one arm.

[6]    It appears that Cody was released from the hospital in mid-November 1991.

Appellee Bussey was assigned to investigate the Bravo facility with respect to whether Cody's injuries could have been caused while he was there.[7] On November 18, Bussey visited the Bravo household and interviewed Mrs. Bravo, her husband, and their daughter. Bussey also interviewed a child in Mrs. Bravo's care and several parents of other children in her care; none of the parents reported any suspicion of mistreatment of their children at the Bravo home.[8] Also on November 18, Bussey and Davis interviewed

_____

[7]   Bussey's investigation was conducted jointly with David Davis, an Air Force investigative agent.

[8]   Bussey's affidavit states that Mr. and Mrs. Bravo had no knowledge of how Cody was injured; they were spontaneous and unwavering that Cody was not hurt in their home; and, when he asked them what should happen to someone who abuses a small child, they responded without hesitation that "they should go to jail". Bussey's affidavit states further that the Bravos' teenaged daughter admitted that she had tapped children on the hand and told them "no" when they misbehaved, but claimed that she was unaware of how Cody was injured and was certain it did not happen at her home; she also told him that anyone who hurt a child like Cody should be punished. Bussey also stated in his affidavit that he spoke with Air Force investigator Davis on December 9, and that Davis told him that Mrs. Bravo had taken a polygraph examination and "passed with flying colors". Although Kiser asserts in his brief that DHS effectively closed its investigation of the Bravo family after a brief visit on November 18, Bussey's affidavit reflects that his investigation continued until at least mid-December.

     In response to the summary judgment motion, Kiser submitted an affidavit of a private investigator he hired to investigate the Bravo facility, in which the investigator stated that Mr. Bravo had been arrested at least 12 times between September 1982 and September 1991; and that Mrs. Bravo told him that Mr. Bravo had a drinking problem and was physically abusive, that she had been beaten, kicked, and threatened by her husband on numerous occasions and was very afraid of him, that she had filed family violence complaints against him in August 1990, August 1991, and twice in September 1991, and that he was at home all day on the day Cody's arm was broken. Kiser's investigator stated also that he had interviewed another parent who had used the Bravo day-care facility until her five-month-old child was injured there in March 1990; the parent stated that DHS investigators believed Mrs. Bravo's

Kiser;[9] and, on November 26, he took a polygraph examination, which yielded inconclusive results. On the advice of his attorney, Kiser refused to submit to another.

On December 10, the state court ordered Kiser to move out of his home and permitted Cody to return there with his mother. But, three days later, Cody was removed from his home again, and placed in foster care. On March 19, 1992, the state court granted Cody's paternal grandmother's request to be appointed temporary possessory conservator, and ordered that the Kisers have unlimited supervised visitation. Cody was placed in his grandmother's custody on March 22, where he remained until he returned to his home (that May).

Earlier, in January 1992, on the recommendation of Dr. Herbert, the Kisers obtained court authorization to have tests conducted on Cody to determine whether he suffered from osteogenesis imperfecta, a genetic defect. The tests were completed in May 1992, ruling out that possibility. Thereafter, on

explanation that the child had fallen on a toy, but that a four-year-old who was in care at the Bravo facility had told her that her baby got "pow-wowed" (hit in the face).

Kiser also submitted Bussey's May 14, 1992, deposition taken in the state court custody proceeding in which Bussey testified that DHS received a complaint that a child was injured in the Bravo facility in March 1990, and that, after an investigation, DHS determined that the child bruised her cheek when she fell onto an article in a playpen; Mrs. Bravo was cited for not adequately supervising the children.

[9] Bussey's affidavit states that Kiser denied knowledge of how Cody was injured, minimized the seriousness of physical abuse of children, and made statements to the effect that someone who would do such a thing to a child should get treatment in therapy. Kiser's affidavit states that he told the investigators that the authorities "should find out what happened and deal with it" if someone deliberately hurts a baby.

May 19, the custody proceedings were dismissed; and, as noted, Cody was allowed to return home. A criminal investigation of Kiser was concluded in October 1992. The appellees made no final determination as to who was responsible for causing Cody's injuries.

In late 1993, Kiser filed suit against the appellees and others under 42 U.S.C. § 1983, claiming violation of a Fourteenth Amendment due process right not to be deprived of a liberty interest in living peaceably in a family.[10] The appellees moved to dismiss, asserting, *inter alia*, qualified immunity. But, the district court entered an order the next day, requiring that any motion to dismiss or for summary judgment on qualified immunity be filed within 30 days. The appellees then moved for summary judgment, again asserting qualified immunity.

The early motion to dismiss was denied without explanation; the district court later denied the appellees' motion for clarification of whether the order had denied their qualified immunity defenses. During the pendency of the appellees' interlocutory appeal of that order, however, the district court granted their summary judgment motion. The court acknowledged that the appellees had asserted qualified immunity defenses, but

---

[10]    The complaint and amendments do not specify whether Kiser asserted procedural or substantive due process violations. The § 1983 claims against Davis, District Attorney Smith, and Assistant District Attorney Roberts were dismissed prior to the summary judgment; and the dismissal of those claims is not before us. The district court declined to exercise supplemental jurisdiction over a state law negligence claim against Mrs. Bravo, and dismissed that claim without prejudice. At oral argument, Kiser acknowledged that the claim had been abandoned.

declined to consider them, holding instead that, as a matter of law, a right to due process was not violated because Kiser received notice and a hearing before the appellees removed Cody from the Kisers' home, and other hearings were conducted while Cody was temporarily out of the home.

## II.

Kiser contends that the district court erred both by failing to address the substantive due process claims and by granting summary judgment against the procedural due process claims. Kiser stresses that he does not challenge the appellees' actions in removing Cody from his home, but asserts, instead, that the appellees, by continuing their investigation of Kiser long after they were in possession of information that conclusively showed that he could not have been responsible for Cody's injuries, violated the substantive due process right to family integrity. The procedural due process claim is based on the appellees' alleged withholding of exculpatory evidence. The appellees counter that, *inter alia*, the summary judgment should be affirmed on qualified immunity grounds.

After the summary judgment, our court, on the appellees' motion, dismissed their interlocutory appeal from the denial of their motion to dismiss. Kiser contends that the appellees waived their qualified immunity defenses when they dismissed that appeal. We disagree. Qualified immunity is not waived when a defendant fails to take an interlocutory appeal and, instead, subjects himself to discovery and trial. ***Matherne v. Wilson***, 851 F.2d 752,

756 (5th Cir. 1988).  It would be anomalous to conclude that a defendant waives a qualified immunity defense by dismissing as moot an interlocutory appeal that the defendant was not required to take in the first place.

In any event, in addition to raising qualified immunity in their motion to dismiss, the appellees raised it in their summary judgment motion.  Although the district court did not rely on qualified immunity in granting summary judgment, it is more than well-settled that an appellee generally may urge in support of a judgment any matter appearing in the record.  *E.g.*, **City of Safety Harbor v. Birchfield**, 529 F.2d 1251, 1254 n.4 (5th Cir. 1976).  Likewise, we may affirm a summary judgment on issues raised in the district court, even if not relied on by it.  *See, e.g.*, **Chevron U.S.A., Inc. v. Traillour Oil Co.**, 987 F.2d 1138, 1146 (5th Cir. 1993).[11]

In considering qualified immunity claims, we apply a well-established two-part analysis; this appeal involves only the first part.  "We must first determine whether the plaintiff[s] ha[ve] `allege[d] the violation of a clearly established constitutional right'".  **Spann v. Rainey**, 987 F.2d 1110, 1114 (5th Cir. 1993) (quoting **Siegert v. Gilley**, 500 U.S. 226, 111 S. Ct. 1789, 1973 (1991)).  Because "many general constitutional rights ... are

---

[11]    It goes without saying that our review of a summary judgment is plenary; that we apply the same standard applied by the district court, *e.g.*, **F.D.I.C. v. Ernst & Young**, 967 F.2d 166, 169 (5th Cir. 1992); and that it is appropriate if the record discloses "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law".  FED. R. CIV. P. 56(c).

clearly established and yet so general that it often will be unclear whether particular conduct violates the right[,] ... the right the official is alleged to have violated must have been `clearly established' in a more particularized, and hence more relevant, sense:  The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right".  *Hodorowski v. Ray*, 844 F.2d 1210, 1216-17 (5th Cir. 1988).  "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful ...; but it is to say that in light of pre-existing law the unlawfulness must be apparent".  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).[12]

## A.

Kiser acknowledges that the State had a compelling interest in taking custody of Cody when his unexplained injuries were discovered.  He maintains, however, that the appellees soon became aware through their investigation that he could not have caused Cody's injuries, and that the injuries were most likely to have occurred while Cody was in the physical control of Mrs. Bravo.[13]

---

[12]    Only if there was violation of a constitutional right that was clearly established do "we then decide whether the defendant[s'] conduct was objectively reasonable".  *Spann v. Rainey*, 987 F.2d at 1114 (citing *Salas v. Carpenter*, 980 F.2d 299, 305-06 (5th Cir. 1992)).  "[T]he objective reasonableness of an official's conduct must be measured with reference to the law as it existed at the time of the conduct in question." *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1185 (5th Cir. 1990).  As stated, we do not reach this part of the two-part analysis.

[13]    In support of the assertion that the investigation should have made the appellees aware of the unlikelihood that Kiser was responsible for Cody's injuries, and that the injuries were likely

Kiser contends that the appellees, by continuing their investigation of Kiser and maintaining custody of Cody after their investigation revealed exculpatory evidence exonerating Kiser, violated the substantive due process right to be free of temporary

_____

to have occurred in the Bravo home, Kiser asserts that: (1) Cody's stepsister told investigators on November 15 that Mrs. Bravo frequently lifted Cody in a manner likely to have caused the injuries; (2) investigators claimed to have screened police arrest and conviction records in their investigation of the Bravo day-care facility, but later claimed not to have discovered that Mrs. Bravo's husband had multiple arrests and convictions for assault, crimes involving alcohol, and domestic violence; (3) the investigators acknowledged being aware of past reports of child abuse in the Bravo home, but discounted the significance of those reports; and (4) investigators failed to inspect safety conditions in the Bravo home and failed to attempt to verify statements made by Mrs. Bravo on her applications for registration, some of which later proved to be false.

The appellees dispute Kiser's characterization of what they learned from their investigation. According to them, their investigation did not exonerate Kiser, and they were never able to determine who was responsible for Cody's injuries. The appellees' summary judgment evidence includes the affidavits of Stinson, Garrett, and Green (the DHS case worker who was assigned to replace Garrett in the Kiser investigation in January 1992), in which they state that they observed Cody crying uncontrollably during visits with his parents, causing them to suspect that Cody might have a reason to fear his parents. The appellees state that none of the information obtained in the investigation of the Bravo home, including polygraph test results on Mrs. Bravo and Kiser, observations of the Bravos and the Kisers, and interviews with other individuals whose children were placed in Mrs. Bravo's care, led them to conclude that Kiser was not a possible cause of his son's injuries. The appellees note that they were unaware of Mr. Bravo's 1990 arrest until informed of it by the Kisers, and state that the alleged prior child abuse at the Bravo home was actually a reported injury which was investigated and found not to involve abuse.

Kiser's affidavit states that Cody seemed "happy" and "normal" during the first few parental visits after he was in DHS custody, but that, during a visit on December 2, Cody became upset after Garrett got mad and threw a notebook across the room; he states that Cody "got fussy" after about half an hour during a visit two days later.

interference by the State in a parent-child relationship. Kiser contends further that the appellees acted oppressively by withholding exculpatory evidence and giving false testimony in the state court.[14]

Kiser acknowledges that our court has not recognized definitively the substantive due process right now asserted, but maintains that relevant case law can be extrapolated to recognize such a right. He cites *Santosky v. Kramer*, 455 U.S. 745 (1982), and *Lassiter v. Department of Social Services*, 452 U.S. 18 (1981), in support of the assertion that the Supreme Court has long recognized that, for Fourteenth Amendment purposes, a freedom of personal choice in matters of family life is a fundamental right implicit in the concept of ordered liberty and worthy of protection under the substantive component of the due process clause.

In *Lassiter*, the county social services agency petitioned the state court to terminate permanently the parental rights of a mother who had left her child in foster care for more than two years and had been convicted for second-degree murder and sentenced to 25-40 years imprisonment. 452 U.S. at 20-21. The Court acknowledged that "a parent's desire for and right to `the

---

[14]    Kiser asserts that, despite Cody's treating physicians' desire to test for osteogenesis imperfecta, and their continuing uncertainty as to whether the disease may have caused the injuries, appellee Garrett testified falsely at a hearing on November 27, 1991, that the physicians had ruled out non-traumatic causes; and that on December 10, Garrett again testified falsely that osteogenesis imperfecta had been ruled out as a cause of the injuries. He asserts further that, despite Garrett's admission to members of the Kiser family on November 22 that DHS had no evidence implicating Kiser, she testified on November 27 that Cody would be in danger of further injury if returned to his home.

companionship, care, custody and management of his or her children'
is an important interest that `undeniably warrants deference and,
absent a powerful countervailing interest, protection'", *id*. at 27,
but concluded that, under the circumstances of that case, the state
court did not deny the mother due process of law when it failed to
appoint counsel to represent her in the parental termination
proceeding. *Id*. at 32-33.

In **Santosky**, child care workers sought to terminate
permanently the parents' custody of their children. Citing
**Lassiter**, the Court noted its historical recognition that freedom
of personal choice in matters of family life is a fundamental
liberty interest protected by the Fourteenth Amendment. *Id*. at
753. In light of the nature of the private interest threatened and
the permanency of the threatened loss, *id*. at 758, it held that a
state could not sever permanently the parent-child relationship
without providing the parents with "fundamentally fair procedures",
*id*. at 754, including supporting its allegations of neglect with
"clear and convincing evidence". *Id*. at 747-48.

As Kiser acknowledges, both **Lassiter** and **Santosky** were
procedural due process cases, and thus did not address the nature
of substantive protections available in the family integrity
context. Moreover, both are distinguishable, because they involved
attempts to terminate *permanently* the parent-child relationship.

Kiser acknowledges also that in **Hodorowski v. Ray**, 844 F.2d
1210 (5th Cir. 1988), and **Doe v. Louisiana**, 2 F.3d 1412 (5th Cir.
1993), *cert. denied*, ___ U.S. ___, 114 S. Ct. 1189 (1994), our

- 12 -

court found no clearly-established right to family integrity when a state seeks to interfere temporarily with custody.  His attempt to distinguish those cases on the ground that they dealt with qualified immunity is unavailing in light of our rejection of his contention that the appellees waived their qualified immunity defenses.

In *Hodorowski*, child protective services workers removed two seven-year-old girls from their parents' home without a prior court order, after receiving information that the children were being abused by their father.  844 F.2d at 1212.  The parents claimed interference with family integrity in violation of the Fourteenth Amendment.  *Hodorowski* recognized that "the right of the family to remain together without the coercive interference of the awesome power of the state" is "the most essential and basic aspect of familial privacy", *id*. at 1216, but held that the defendants were entitled to qualified immunity because the right to family integrity had been defined in such general terms that reasonable officials would not have understood that their conduct violated that right.

> It is beyond dispute that many aspects of family integrity possess constitutional stature.  But reasonable government officials, knowing only that they must not infringe on family integrity, would not necessarily know just what conduct was prohibited.  In particular, in the absence of any more fact-specific authority, we do not think that appellants in this case should have known that their conduct in removing the Hodorowski children from the home violated the nebulous right of family integrity.

*Id*. at 1217.

The ***Hodorowski*** court acknowledged that it is "undeniable that concern for family integrity figured prominently in the Court's rationale", ***id.***, in both ***Santosky*** and ***Stanley v. Illinois***, 405 U.S. 645, 649 (1972) (holding that due process requires a hearing before a state can terminate permanently the parental rights of unmarried fathers), but stated that "it would be a mistake to conclude that, from ***Santosky*** and ***Stanley*** alone, the appellants should have known that taking the Hodorowski children into temporary custody violated a constitutional right". ***Id***. Observing that both ***Santosky*** and ***Stanley*** involved a state's attempt to sever permanently the parent-child relationship, while ***Hodorowski*** concerned an attempt to obtain only temporary custody, our court stated that "[t]his difference alone is sufficient to prevent us from concluding that appellants' conduct violated clearly established law". ***Id***.[15]

Kiser attempts to distinguish ***Hodorowski*** on the basis that it does not reflect that there were any allegations that DHS investigators contrived or concealed evidence, misrepresented facts to the court, or otherwise acted in bad faith. But, the absence of

---

[15] *Cf*. ***Davis v. Page***, 640 F.2d 599, 602 (5th Cir. 1981) (en banc), *vacated on other grounds*, 458 U.S. 1118 (1982), in which our court stated that a mother whose child had been taken into temporary custody, without her being fully informed of the possibility prior to a dependency hearing, had a liberty interest at stake in the dependency hearing that was protected by the due process clause of the Fourteenth Amendment. The court considered that "the interest of a parent in the companionship, care, custody, and management of his or her children come[s] to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements". ***Id***. at 603 (internal quotation marks and citation omitted). The court stated that this interest demanded "the full procedural protection necessary to avoid the erroneous deprivation of that interest". ***Id***.

such allegations in *Hodorowski* does not support a conclusion that the nebulous, ill-defined right to family integrity is more clearly established when evidence or allegations of such misconduct is present.

Such allegations of misconduct were made in *Doe v. Louisiana*; our court concluded nevertheless that the parent's claimed right to a liberty interest in family integrity was not clearly established. 2 F.3d at 1417-18. There, state social workers conducted a four-month investigation after a physician reported suspected sexual abuse of a four-year-old girl. *Id*. at 1414. The father complied with the social worker's demand that he have no contact with either his daughter or his son during the investigation. *Id*. The state court dismissed a civil "child-in-need-of-care" proceeding following a hearing at which no evidence of physical abuse was presented, and at which there was evidence that the social workers had suppressed the results of reports indicating that no sexual abuse had occurred, misrepresented the findings in those reports, and given false information to the district attorney's office in an effort to have the children taken from the temporary custody of their paternal grandparents. *Id*. at 1414-15.

Suit was filed against the social workers, claiming that they interfered with the father's fundamental liberty interest in the care and custody of his children, violated his constitutional right to be free from malicious prosecution, and violated the children's privacy. *Id*. at 1415. Our court reversed the denial of the motion to dismiss, holding that the social workers were entitled to

qualified immunity because preexisting law did not establish that they "should have known that their conduct violated the nebulous right of family integrity".  *Id*. at 1418.

*Doe* cited with approval *Frazier v. Bailey*, 957 F.2d 920 (1st Cir. 1992), which involved similar facts and allegations.  There, the plaintiff alleged that a social worker interfered with his liberty interest in the care, custody, and management of his children by ignoring exculpatory evidence and by programming his children to falsely accuse him of sexual abuse.  *Id*. at 925, 929. The First Circuit noted that, "[b]ecause th[e] [liberty] interest [in familial relationships] must always be balanced against the governmental interest involved, it is difficult, if not impossible, for officials to know when they have violated `clearly established' law".  *Id*. at 931.  It held that the defendants were entitled to qualified immunity, "[b]ecause the right to family integrity has not been so particularized as to put defendants on notice that their conduct was unlawful".  *Id*.

As stated, Kiser asserts that because *Doe* was a qualified immunity case, it should be distinguished in its application to the present controversy, pursuant to his erroneous claim that immunity was waived.  But, as also stated, we have rejected that waiver contention; we cannot distinguish *Doe* on that basis.  Indeed, *Doe* is indistinguishable; the amorphous right to family integrity was no more clearly defined in late 1991 and the first half of 1992, when DHS investigated Cody's injuries, than it was when the conduct at issue in *Doe* took place in the latter part of 1990.

Kiser also urges us to re-examine our holding in *Doe*, in light of *Doe v. Taylor Independent School District*, 15 F.3d 443 (5th Cir.) (en banc), *cert. denied*, ___ U.S. ___, 115 S. Ct. 70 (1994). Kiser maintains that *Doe v. Louisiana*'s "stern approach" to the substantive due process right asserted in that case is contradicted by *Taylor*, because both cases involve equally appalling behavior by state actors. *Taylor* held that "[t]he `contours' of a student's substantive due process right to be free from sexual abuse and ... bodily integrity" were clearly established in 1987, when a public school teacher sexually abused the plaintiff, a 15-year-old student. *Id*. at 455.

Contrary to Kiser's assertion, *Taylor* does not undermine the validity of *Doe v. Louisiana*'s conclusion that the right to family integrity is not clearly established. And, there is no doubt that it is clearly established in this circuit that "one panel may not overrule the decision, right or wrong, of a prior panel in the absence of en banc reconsideration or superseding decision of the Supreme Court". *E.g.*, *Batts v. Tow-Motor Forklift Co.*, 978 F.2d 1386, 1393 & n.15 (5th Cir. 1992) (internal quotation marks and citation omitted). We therefore decline to re-examine *Doe v. Louisiana*.

Based on the foregoing, it is apparent that, although a substantive due process right to family integrity has been recognized, the contours of that right are not well-defined, and continue to be nebulous, especially in the context of a state's taking temporary custody of a child during an investigation of

possible parental abuse. Even assuming that such a right exists under the circumstances involved here, it certainly was not clearly established when the appellees engaged in the conduct at issue. We hold, therefore, that the appellees were entitled to qualified immunity.[16]

B.

The nature of the procedural due process claim is not entirely clear; it appears to be based on assertions that the appellees failed to disclose to the state court allegedly exculpatory evidence regarding their investigation of Mrs. Bravo for suspected abuse of a child in her care in 1990, and that the appellees failed to disclose that Mrs. Bravo had made material false statements on her application for registration. Kiser relies on cases concerning the procedural due process due in criminal prosecutions, and urges that a requirement of disclosure of exculpatory evidence should apply as readily in a civil context as in the context of a criminal proceeding, but cites no authority in which such a requirement has been applied in a civil proceeding analogous to the one in which the appellees obtained temporary custody of Cody.

We need not decide whether the procedural protections of the due process clause of the Fourteenth Amendment require such disclosure, because even if such a right exists, it was not clearly established at the time of the state court custody proceedings.

---

[16]    As noted, in light of our conclusion that the law was not clearly established when the conduct at issue took place, we need not address whether the appellees' conduct was objectively reasonable, or whether there are material fact issues as to the reasonableness of their actions.

Therefore, the appellees are entitled also to qualified immunity with respect to the Kisers' procedural due process claims.

III.

For the foregoing reasons, the judgment is

**AFFIRMED**.